DUFFCON CONCRETE PRODUCTS, INC., A CORPORATION, PROSECUTOR–RESPONDENT, v. THE BOROUGH OF CRESSKILL, DEFENDANT–APPELLANT.

Argued January 17, 1949—Decided March 7, 1949.

510

Mr. *Walter H. Jones,* argued the cause for the defendant-appellant.

Mr. *James A. Major* argued the cause for the prosecutor-respondent *(Messrs. Breslin & Breslin,* attorneys*).*

Mr. *John A. Errico* filed a brief as attorney for the Joint Council of Municipal Planning Boards in Essex County, N. J., as *amicus curiae.*

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal by the Borough of Cresskill from a judgment of the former Supreme Court setting aside its zoning ordinance.

The Borough is a small residential 'community in Bergen County, comprising about 1,300 acres and having a population of approximately 2,300 persons. In an effort to retain its residential character, the defendant in 1941 adopted a stringent zoning ordinance, establishing four zones, three of which are entirely residential and the fourth ("D" zone) is for "commercial districts for business centers." The pertinent portion of the ordinance dealing with the "D" zone reads *(Article 4, § 4)*:

"A. In any Commercial 'D' District, no building or premises shall be used and no building or part of a building shall be erected which is arranged, intended or designed to be used in whole or in part by any fabricating, manufacturing, converting, altering, finishing or assembling where mechanical power exceeding one horsepower electric motor is used, and where the major object of the establishment is to produce goods for sale other than at retail on the premises, or to furnish a service other than for residents of the locality, and where more than five mechanics or workers are habitually engaged on such work, except that in the following listed industries the maximum number of workers engaged on such work shall be as specified below:

"Carpet cleaning employing two workers.

"Dry cleaning shop employing two workers.

"Dyeing where not more than one dyer is employed.

"Enameling, japanning or lacquering, only where the liquid is applied in tanks of not over five cubic feet capacity.

"Tinsmiths, plumbing, gas, steam or hot water fitting shop employing two workers on the premises.

"Milk bottling or distributing station employing three workers.

"No manufacturing except as above set forth shall be permitted in any Commercial 'D' District."

Early in 1946 the prosecutor purchased a tract of vacant land situated in a commercial zone but abutting on a residential district and distant only two blocks from the public school. Without making any inquiry of the borough officials, the prosecutor filled in the land at an estimated cost of $6,000.00 and, in the middle of May, 1946, without obtaining a permit or applying for a variance, commenced the manufacture of concrete slabs in the open. The slabs were made for sale but not at retail on the premises. The manufacturing operations utilized the services of approximately forty employees and, among other things, a large concrete mixer driven by a ten horsepower motor

and a pneumatic drill. The attendant noise, vibration, dirt and dust was considerable and, in addition, trucks moving to and from the site caused traffic snarls during certain periods of the day on the county highway bordering the tract.

Not until the end of June, 1946, following almost two months of operation in entire disregard of the provisions of the zoning ordinance, did the prosecutor apply to the Borough authorities for permission to conduct its business. The application was in the form of plans for a proposed structure in which the manufacturing of the concrete slabs would be carried on. After a hearing a variance was denied by the local board of adjustment, the governing body concurring. New plans were submitted to the board of adjustment in September, 1946, and by a divided vote a variance was this time recommended. The recommendation, however, was rejected and the variance was denied by the governing body. Thereupon the prosecutor was granted a writ of certiorari to review the action of the municipality. On review the former Supreme Court held that the restriction in the ordinance against heavy industry was beyond the constitutional limits of municipal zoning power and that the discretion confided to the board of adjustment and the governing body by the ordinance to grant a variance was subject to no adequate standard to guide them and it accordingly set aside the action of the municipal bodies.

The quoted portion of the ordinance constitutes an effective exclusion of all heavy industry from the Borough. The chief meritorious question thus hinges upon the power of the municipality so to legislate. There is no constitutional or statutory provision which would lead us to conclude that a municipality in the adoption of a comprehensive zoning scheme is compelled to set apart a portion of its territory for heavy industrial use without regard to its suitability therefor.

It has been argued that such is the intent of the concluding phrase of *R. S.* 40:55-30, where the legislative grant of authority to zone is stated to "include the right to regulate and restrict * * * the location and use and extent of use of buildings and structures and land for trade, industry, residence or other purposes." But *R. S.* 40:55-32, which goes to the heart of the

zoning legislation discloses very clearly the contrary intent of the Legislature.

"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses; and with a view of conserving the value of property and encouraging *the most appropriate use of land throughout such municipality.*"

What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously. The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning. The direction of growth of residential areas on the one hand and of industrial concentration on the other refuses to be governed by such artificial lines. Changes in methods of transportation as well as in living conditions have served only to accentuate the unreality in dealing with zoning problems on the basis of the territorial limits of a municipality. Improved highways and new transportation facilities have made possible the concentration of industry at places best suited to its development to a degree not contemplated in the earlier stages of zoning. The same forces make practicable the presently existing and currently developing suburban and rural sections given over solely to residential purposes and local retail business services coextensive with the needs of the community. The resulting advantages enure alike to industry and residential properties and, at the same time, advance the general welfare of the entire region.

In the present cause the Court will take notice not only of the residential character of the Borough of Cresskill and the suitability of its location for such development, situated as it is on the western slope of the Palisades, but also of the availability and use of the extensive bottom lands of the Hackensack River Valley within the region for industrial purposes. It cannot be doubted that in these circumstances the zoning scheme contemplated by the ordinance here under consideration comprehends, in the language and intent of the statute, "the most appropriate use of land throughout such municipality," R. S. 40:55–32.

Nor, when it is viewed in the light of these considerations, can the ordinance be said to be an arbitrary or unreasonable limitation upon the use of private property violative of either the Federal or state constitutions. The unhappy consequences which have invariably followed the establishment of heavy industry in residential areas are everywhere at hand—intense concentration of population, substandard housing and living conditions, increased fire and traffic hazards, disturbing noises, dirt and odors, with a consequent decline in the value of residential property. Numberless communities in this and other states present the sorry picture of what has been aptly characterized as urban blight. To hold that the state, through its municipal agencies, under conditions such as are here present may not thus afford protection to the health, safety, morals and general welfare of its inhabitants would be to deny one of the fundamental reasons for the existence of government. As Mr. Justice Sutherland stated in *Euclid v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926), one of the leading cases dealing with the constitutional aspects of zoning (71 *L. Ed.* 303, 310) ;

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple ; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago ; probably would have been rejected as arbitrary and oppressive.

Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. * * *"

█ Sound social, economic and governmental policy dictates a separation, where possible, of residential areas and industrial areas. In the case of our holder and fully developed communities, it is now too late to do more than preserve such beneficial features as may have survived the period of spontaneous and uncontrolled growth, and by such costly measures as slum clearance and low-cost housing to attempt to rectify the unwholesome conditions caused by our earlier lack of foresight. Proper zoning today, however, can do much in our newly developing communities to provide and to maintain safer and more healthy living conditions. And where, as here, there exists a small residential municipality the physical location and circumstances of which are such that it is best suited for continuing residential development and, separated therefrom but in the same geographical region, there is present a concentration of industry in an area peculiarly adapted to industrial development and sufficiently large to accommodate such development for years to come, the power of the municipality to restrict its territory to residential purposes with ample provision for such small businesses, trades and light industries as are needed to serve the residents, is clear. *Cf. Hamlett v. Snedeker,* 246 *App. Div.* 758, 283 *N. Y. S.* 906 *(2d Dept.* 1935*).*

█ The provisions in the ordinance creating a local board of adjustment with authority to make special exceptions and to recommend variances are in compliance with the legislative directions contained in *R. S.* 40:55–36. Without such provisions the ordinance would be void, *Somers v. Bradley Beach,* 115 *N. J. L.* 135 *(E. & A.* 1935*).* The guiding standards which govern the exercise of the powers of the board of adjustment are carefully set forth in *R. S.* 40:55–39. Once the board of adjustment is provided for in the zoning ordinance,

its powers stem directly from the statute *(R. S.* 40:55–39*),* and may not in any way be circumscribed, altered or extended by the municipal governing body. Under these circumstances, the inclusion in the zoning ordinance of a word for word recital of the statutory powers of the board of adjustment would be superfluous.

The judgment of the former Supreme Court is reversed.

Justice OLIPHANT concurred in the result.

*For reversal:* Chief Justice VANDERBILT and Justices HE-HER, OLIPHANT, WACHENFELD, and ACKERSON—5.

*For affirmance:* None.