LIONSHEAD LAKE, INC., PLAINTIFF-RESPONDENT, v. TOWNSHIP OF WAYNE, DEFENDANT-APPELLANT.

Argued February 11, 18, 1952—Reargued June 16, 1952—Decided June 26, 1952.

Mr. *Edward A. Markley* and Mr. *James J. Langan* argued the cause for the appellant (*Messrs. Markley & Broadhurst*, attorneys; Mr. *Frederic G. Stickel, III*, on the brief).

Mr. *Reuben P. Goldstein* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff, the owner and developer of a large tract of land in the defendant township, commenced this action in lieu of a prerogative writ challenging the validity of the defendant's zoning ordinance in fixing the minimum size of dwellings and in placing certain of its properties in a residential district. On the plaintiff's motion the trial court entered summary judgment in its favor on the first count, setting aside the provisions of the ordinance fixing the minimum size of dwellings, *Lionshead Lake, Inc., v. Wayne Tp.*, 8 *N. J. Super.* 468 (*Law Div.* 1950). On appeal this judgment was reversed by the Appellate Division of the Superior Court because of the existence of a factual question and the case was remanded for trial, *Lionshead Lake, Inc., v. Wayne Tp.*, 9 *N. J. Super.* 83 (*App. Div.* 1950).

The Township of Wayne is the most extensive municipality in Passaic County. It covers 25.34 square miles in comparison with the 23.57 square miles of Newark. It has a population of 11,815 in comparison with Newark's 437,857. Only 12% of the total area of the township has been built up. Included within its borders are several sizable lakes (the one located within the plaintiff's development, *e. g.,* having an area of about 145 acres) and as a result a considerable number of its residences have been built for summer occupancy only. Although a political entity it is in fact a composite of about a dozen widely scattered residential communities, varying from developments like the plaintiff's

where the average home costs less than $10,000, to more expensive sections where the homes cost from $35,000 to $75,000. It has but little business or industry.

On July 12, 1949, four years after the plaintiff had commenced the development of its Lionshead Lake properties and after over a hundred houses had been constructed there, the defendant adopted a revised zoning ordinance dividing the entire township into four districts; residence districts A and B, a business district and an industrial district, the last two comprising but a very small proportion of the township's total area. In section 3 of the ordinance pertaining to residence A districts it was provided that:

"(d) Minimum Size of Dwellings:
Every dwelling hereafter erected or placed in a Residence A District shall have a living-floor space, as herein defined.

of not less than 768 square feet for a one story dwelling;

of not less than 1000 square feet for a two story dwelling having an attached garage;

of not less than 1200 square feet for a two story dwelling not having an attached garage."

These minimum size requirements for dwellings were made applicable to residence B districts by section 4 (d) of the ordinance, to business districts by section 5 (c), and to industrial districts by section 6 (b) 1, the result being that the same minimum size requirements for dwellings prevail throughout the entire township.

Within the entire township only about 70% of all the existing dwellings meet the minimum requirements of the ordinance; in some sections of the township as few as 20% of the existing dwellings comply with the ordinance requirements, in others (among them the plaintiff's Lionshead Lake development) only about 50% are above the prescribed minimum, while in other areas the percentage of compliance is far greater, reaching 100% in some of the more exclusive sections. The low percentage of compliance in certain areas

is not particularly significant, however, for the reason that the township is as yet substantially undeveloped. Compliance with the requirements of the ordinance in the future will undoubtedly result in the nonconforming houses comprising but a small minority even in those areas where they are now in the majority. There was testimony to the effect that to build a house for year-round occupancy having the minimum 768 square feet of living space would cost from $10,000 to $12,000, if mass produced, and that only about 30% of the population were financially able to afford such homes. The plaintiff's witness who so testified, a builder and developer, was hardly qualified, however, to express an opinion as to the financial ability of present and potential residents of the township and his opinion as to construction costs was considerably out of line with that of the defendant's expert who testified that homes complying with the ordinance could be and were being built at a cost of $8,500 to $9,200 if for year-round occupancy and $7,500 to $8,200 if for seasonal use only.

To meet the plaintiff's attack on the reasonableness of the ordinance the defendant produced a recognized public health expert, who testified that the living-floor space in a dwelling had a direct relation to the mental and emotional health of its occupants and that he had developed scientific standards for different size families: 400 square feet for one person 750 square feet for two persons, 1,000 square feet for three persons, 1,150 square feet for four persons, 1,400 square feet for five persons and 1,550 square feet for six persons. These the witness considered as desirable goals rather than legal standards. He conceded that the housing standards prescribed by the agencies of the Federal Government are below those written into the ordinance, as are those of the New Jersey *Code of Minimum Construction Requirements for One and Two Family Dwellings,* prepared by the Department of Economic Development, Division of Planning and Engineering (1946), which, however, does not have the force of law but is merely advisory.

After considering this and other evidence the trial court concluded that the minimum size requirements of the ordinance were not reasonably related to the public health, were arbitrary and unreasonable, and not within the police powers of the defendant. Accordingly judgment was entered on the first count of the complaint in favor of the plaintiff setting aside the minimum size of dwelling requirements with respect to the residence A and residence B districts in which the plaintiff's property is located. The plaintiff failed to introduce any proof in support of the second count of its complaint in which it objected to the placing of its property in a residential zone. The court therefore granted the defendant's motion for a dismissal thereof with prejudice, but subsequently declined to enter formal judgment to that effect. On the petition of the defendant we granted certification to review the judgment of the trial court with respect to the first count and its refusal to enter judgment with respect to the second count.

The zoning powers of municipalities have been extended by *Art. IV, Sec. VI, par.* 2 of the *Constitution of* 1947:

"The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, *and the nature and extent of the uses of land,* and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature."

The zoning statutes then in effect were amended by chapter 305 of the Laws of 1948 to give effect to the expansion of the zoning power contemplated by the addition of the italicized words to the corresponding provision of the 1844 Constitution (*Art. IV, Sec. VI, par.* 5). Moreover, by *Art. IV, Sec. VII, par* 11 of the *Constitution of* 1947, which had no counterpart in the 1844 Constitution, we are required to construe the constitutional and statutory provisions pertaining to zoning liberally in favor of a municipality:

"The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law."

█ When the enabling zoning statutes, *R. S.* 40:55–30 and 31, both as amended by chapter 305 of the Laws of 1948, *supra,* and *R. S.* 40:55–32, are read in the light of the constitutional mandate to construe them liberally, there can be no doubt that a municipality has the power by a suitable zoning ordinance to impose minimum living-floor space requirements for dwellings. *N. J. S. A.* 40:55–30 provides:

"Any municipality may by ordinance, limit and restrict to specified districts and may regulate therein, buildings and structures according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority, subject to the provisions of this article, shall be deemed to be within the police power of the State. * * *

The authority conferred by this article shall include the right to regulate and restrict the height, number of stories, and sizes of buildings, and other structures, the percentage of lot that may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the location and use and extent of use of buildings and structures and land for trade, industry, residence, or other purposes."

*N. J. S. A.* 40:55–31 provides:

"For any or all or said purposes the governing body or board of public works may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this article, and it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings or other structures, and the nature and extent of the uses of land, within such districts. * * *"

The purposes of zoning are set forth in *R. S.* 40:55–32 as follows:

"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes; to lessen congestion in the streets; secure safety from fire, panic and

other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."

Thus not only has the Constitution conferred on the Legislature very broad powers to pass enabling acts with respect to zoning but the Legislature in a like effort to make effective its constitutional power in this respect has given the municipalities similar broad powers expressed in considerably greater detail than in the Constitution. To the traditional presumption with respect to the validity of every legislative act there has been added, moreover, the constitutional mandate to construe such legislation liberally in favor of the municipalities. These constitutional and statutory changes have in effect adopted the reasoning of the dissenting opinion in *Brookdale Homes, Inc., v. Johnson*, 126 *N. J. L.* 516 (*E. & A.* 1941) and rendered inapplicable the decision of the majority of the Court of Errors and Appears holding invalid an ordinance imposing minimum restrictions on the size of dwellings to protect the character of a community and property values therein, *Id.*, 123 *N. J. L.* 603 (*Sup. Ct.* 1940), affirmed o. b. 126 *N. J. L.* 516 (*E. & A.* 1941). We are bound by these changes in our organic law and accordingly this court in *Schmidt v. Board of Adjustment of the City of Newark*, 9 *N. J.* 405 (1952), has held that so long as the zoning ordinance was reasonably designed, by whatever means, to further the advancement of a community as a social, economic and political unit, it is in the general welfare and therefore a proper exercise of the zoning power. The underlying question before us is whether in the light of these constitutional and legislative provisions the zoning ordinance of the defendant township is arbitrary and unreasonable. That question, moreover, must be answered in the light of the facts of this particular case. We must bear in

mind, finally, that a zoning ordinance is not like the law of the Medes and Persians; variances may be permitted, the zoning ordinance may be amended, and if the ordinance proves unreasonable in operation it may be set aside at any time.

In *Duffcon Concrete Products, Inc., v. Borough of Cress-kill,* 1 *N. J.* 509, 513 (1949) we said:

"What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously."

The Township of Wayne is still for the most part a sparsely settled countryside with great natural attractions in its lakes, hills and streams, but obviously it lies in the path of the next onward wave of suburban development. Whether that development shall be "with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality" and whether it will "prevent the overcrowding of land or buildings" and "avoid undue concentration of population" depends in large measure on the wisdom of the governing body of the municipality as expressed in its zoning ordinance. It requires as much official watchfulness to anticipate and prevent suburban blight as it does to eradicate city slums.

Has a municipality the right to impose minimum floor area requirements in the exercise of its zoning powers? Much of the proof adduced by the defendant township was devoted to showing that the mental and emotional health of its inhabitants depended on the proper size of their homes. We may take notice without formal proof that there are minimums in housing below which one may not go without risk of impairing the health of those who dwell therein. One does not need extensive experience in matrimonial causes to become aware of the adverse effect of overcrowding on the well-being of our most important institution, the home.

Moreover, people who move into the country rightly expect more land, more living room, indoors and out, and more freedom in their scale of living than is generally possible in the city. City standards of housing are not adaptable to suburban areas and especially to the upbringing of children. But quite apart from these considerations of public health which cannot be overlooked, minimum floor-area standards are justified on the ground that they promote the general welfare of the community and, as we have seen in *Schmidt v. Board of Adjustment of the City of Newark,* 9 *N. J.* 405 (1952), *supra,* the courts in conformance with the constitutional provisions and the statutes hereinbefore cited take a broad view of what constitutes general welfare. The size of the dwellings in any community inevitably affects the character of the community and does much to determine whether or not it is a desirable place in which to live. It is the prevailing view in municipalities throughout the State that such minimum floor-area standards are necessary to protect the character of the community. A survey made by the Department of Conservation and Economic Development in 1951 disclosed that 64 municipalities out of the 138 reporting had minimum dwelling requirements. In the light of the Constitution and of the enabling statutes, the right of a municipality to impose minimum floor-area requirements is beyond controversy.

■ With respect to every zoning ordinance, however, the question remains as to whether or not in the particular facts of the case and in the light of all of the surrounding circumstances the minimum floor-area requirements are reasonable. Can a minimum of living floor space of 768 square feet for a one-story building; of 1,000 square feet for a two-story dwelling having an attached garage; and of 1,200 square feet for a two-story dwelling not having an attached garage be deemed unreasonable in a rural area just beginning to change to a suburban community? It is significant that the plaintiff admits that of the 100 houses in its development 30 met the minimum requirements when constructed and 20

more by voluntary additions of the owners to meet their individual needs have been enlarged to conform to the minimum requirements of the ordinance, and while this litigation has been pending 20 others have been constructed conforming to the ordinance. If some such requirements were not imposed there would be grave danger in certain parts of the township, particularly around the lakes which attract summer visitors, of the erection of shanties which would deteriorate land values generally to the great detriment of the increasing number of people who live in Wayne Township the year round. The minimum floor area requirements imposed by the ordinance are not large for a family of normal size. Without some such restrictions there is always the danger that after some homes have been erected giving a character to a neighborhood others might follow which would fail to live up to the standards thus voluntarily set. This has been the experience in many communities and it is against this that the township has sought to safeguard itself within limits which seem to us to be altogether reasonable.

██ Two minor points raised on this appeal remain to be determined. The defendant contends that the plaintiff's action is premature in that no application to the building inspector of the township was made and denied prior to making this attack on the ordinance. The point is without merit under *Fischer v. Township of Bedminster,* 5 *N. J.* 534 (1950).

██ Finally, the defendant contends that the trial court erred in failing to enter judgment dismissing with prejudice the second count of the plaintiff's complaint, despite the fact that the defendant's motion to that effect was granted because of the plaintiff's failure to adduce any proof in support thereof. We fail to understand the trial court's reluctance on this point and are of the opinion that the defendant is entitled to have its judgment of dismissal with prejudice duly signed and entered.

The judgment on the first count of the plaintiff's complaint is reversed. Judgment shall be entered with prejudice

in favor of the defendant on the second count of the complaint.

JACOBS, J. (concurring). The Township of Wayne is a sprawling residential municipality which is sparsely populated and largely undeveloped. Like many North Jersey communities it is fertile territory for extensive development; unlike less fortunate communities it is still in a position to plan and control its development and avoid the ravages which may be observed in unplanned and unsightly urban, and occasional suburban, municipalities.

In 1946 the township, acting through its planning board, engaged a professional city planner to formulate a master plan. Working with the board and a citizens committee he submitted his plan and included therein a recommendation that every new dwelling in the township have minimum living space of 1,200 square feet. After considerable discussion the township declined to accept the proposed minimum but did provide in its ordinance of July 12, 1949, that one-story dwellings shall have not less than 768 square feet, that two-story dwellings with garages attached shall have not less than 1,000 square feet, and that two-story dwellings without garages attached shall have not less than 1,200 square feet. The figure of 768 feet was approved after weighing all the pertinent factors including the fact that during the preceding year 85% of the applications for building permits were for dwellings containing 768 feet or more in living space and the further fact that the 768 figure would enable the use of "standard size lumber" in 24' x 32' houses. The provisions with respect to two-story dwellings were influenced in considerable part by aesthetic considerations which I believe to be entirely proper. See *Point Pleasant Beach v. Point Pleasant Pavilion*, 3 *N. J. Super.* 222, 225 (*App. Div.* 1949); Heher, J., dissenting in *Brookdale Homes, Inc., v. Johnson*, 126 *N. J. L.* 516, 521 (*E. & A.* 1941); Sayre, Aesthetics and Property Values, 35 *A. B. A. J.* 471 (1949); Zoning: Permissible Purposes, 50 *Col. L. Rev.* 202, 212 (1950). In

the *Point Pleasant* case I recently expressed the view, to which I adhere fully, "that it is in the public interest that our communities, so far as feasible, should be made pleasant and inviting and that primary considerations of attractiveness and beauty might well be frankly acknowledged as appropriate, under certain circumstances, in the promotion of the general welfare of our people." And in the *Brookdale* case Justice Heher expressed the view that, on principle, regulation on aesthetic grounds would seem to be within the police power "if so far promotive of the interests of the public at large, through the resultant community development and profit, as to outweigh the incidental restraint upon private ownership." *Cf. Wright v. Vogt,* 7 N. J. 1, 7 (1951); *General Outdoor Adv. Co. v. Department of Public Wks.,* 289 *Mass.* 149, 193 *N. E.* 799, 816 (*Sup. Jud. Ct.* 1935), appeal dismissed *General Outdoor Advertising Co. v. Hoar,* 297 *U. S.* 725, 56 *S. Ct.* 495, 80 *L. Ed.* 1008 (1936); *Perlmutter v. Greene,* 259 *N. Y.* 327, 332, 182 *N. E.* 5, 6 (*Ct. App.* 1932). To the extent that our earlier cases express outmoded narrower doctrines (see *Passaic v. Paterson Bill Posting Co.,* 72 N. J. L. 285, 287 (*E. & A.* 1905)) they ought to be expressly disavowed.

In the light of modern understanding, adequate living space must be considered as having reasonable relation to health, particularly mental and emotional health. See *Report on Planning the Home for Occupancy* issued by the Committee on the Hygiene of Housing of the American Public Health Association, *pp.* 1, 17 (1950); *Thompson v. City of Carrollton,* 211 *S. W.* 2d 970 (*Tex. Civ. App.* 1948); *Flower Hill Building Corp. v. Village of Flower Hill,* 199 *Misc.* 344, 100 *N. Y. S.* 2d 903 (*Sup. Ct.* 1950). *Cf. Simon v. Needham,* 311 *Mass.* 560, 42 *N. E.* 2d 516, 141 *A. L. R.* 688 (*Sup. Jud. Ct.* 1942). During the trial below Dr. Winslow, Professor of Public Health at Yale University for over 30 years, testified forcefully to that effect and also pointed out that "the sense of inferiority due to living in noticeable sub-standard homes probably does more damage to

the health of children than all the unsanitary plumbing." See 60 *Yale L. J.* 507 (1951). His studies have led him to the view that the proper goals for the present are 400 square feet minimum living space for one person, 750 for two, 1,000 for three and 1,150 for four; the average family in Wayne Township contains between three and four persons. It may be noted that there are numerous communities in our State which have comparable minimum living space requirements. Mr. Herbert H. Smith, Chief of the Planning Section of the New Jersey Department of Conservation and Economic Development, testified that of 138 communities replying to his inquiries 64 have such requirements, including 21 which have a single minimum applicable throughout the entire municipality.

The township's ordinance was attacked by complaint filed in the Law Division in August, 1950, by the plaintiff, a corporation which had developed Lionshead Lake. Prior to July, 1949, it had built approximately 100 houses, including many which contained lesser living space than provided in the ordinance; since the adoption of the ordinance 20 additional houses have been built, all satisfying the prescribed minimum living space requirements. The plaintiff has not at any time sought any exception or variance under *R. S.* 40:55–39; on the contrary it sought and obtained from the lower court a judgment which determined that the ordinance is "invalid with respect to Residence 'A' and 'B' District in which the plaintiff's property is situated, and the same be and is hereby set aside and of no force and effect and for nothing holden." *Lionshead Lake, Inc., v. Tp. of Wayne,* 13 *N. J. Super.* 490, 500 (*Law Div.* 1951). The plaintiff's purpose apparently was to resume the construction of structures, discontinued upon the adoption of the ordinance, containing 484 square feet of living space. The record contains photographs of these tiny structures described at one point as "doll houses"; perhaps the following excerpt from Jonathan Swift's *Verses on Blenheim,* though in other context, is not inappropriate:

"Thanks, sir, cried I, 'tis very fine,
But where d'ye sleep, or where d'ye dine?
I find, by all you have been telling,
That 'tis a house, but not a dwelling."

It seems to me that the lower court's striking down of the township's ordinance was clearly erroneous. See *Thompson v. City of Carrollton, supra,* where an ordinance prescribing a minimum of 900 square feet was sustained; *Dundee Realty Co. v. Omaha,* 144 *Neb.* 448, 13 *N. W. 2d* 634 (1944) where an ordinance providing for 1,000 square feet minimum for one-story dwellings and 1,200 square feet minimum for more than one-story dwellings was likewise sustained; and *Flower Hill Building Corp. v. Village of Flower Hill, supra,* where the court declined to declare that an 1,800 square feet minimum was invalid on its face. Admittedly the township's ordinance was entitled to the benefit of the presumption of validity and reasonableness. *Lumund v. Board of Adjustment of the Borough of Rutherford,* 4 *N. J.* 577, 586 (1950); *Guaclides v. Englewood Cliffs,* 11 *N. J. Super.* 405, 411 (*App. Div.* 1951). It constituted important legislative action representing the governing body's best judgment as to what zoning restrictions were required to promote the health, morals and general welfare of the community as a whole. Decent respect for its problems and sincerity required that its action remain unimpaired in the absence of clear showing that it was arbitrary, unreasonable, or beyond the authority of the general Zoning Act. *Cf. Ogden v. Saunders,* 12 *Wheat.* 213, 270, 25 *U. S.* 213, 270, 6 *L. Ed.* 606, 625 (1827). I find no such showing in the record.

A witness for the plaintiff testified that at the time of the adoption of the ordinance the cost of a house containing 768 square feet of living space, if mass produced, would approximate $9,500 to $10,500. On the other hand, another witness testified "that a year round one-family home, containing 768 square feet in area complying in all respects with the building code of the Township of Wayne would presently cost between $8,500 and $9,200." Applications

for permits filed by the plantiff since the passage of the ordinance indicated that it was constructing such houses at even lesser stated costs. The record contains nothing to indicate the buying power of residents of Passaic County where Wayne Township is located, although the May 10, 1952, issue of Sales Management (at *p.* 414) estimates that Passaic County has an average effective buying income per annum of $6,000 per family, and represents the forty-ninth highest county in the United States. In the light of the foregoing I find no basis for the suggestion that the minimum in the ordinance is unreasonably high; in any event it is clearly within the broad range which should be allowed in the interests of social progress. *Cf. Schmidt v. Board of Adjustment, Newark,* 9 *N. J.* 405, 416 (1952).

The further suggestion has been advanced that the ordinance is defective in that it does not differentiate between various sections of the township and is not related to the number of occupants of the dwelling. This ignores the fact that the ordinance prescribes only *minimum* footage which is small enough to be applicable throughout the entire community. If any neighborhood ought have a higher minimum perhaps it will be dealt with in a later ordinance; in the meantime no harm is done to it by any of the present restrictions. Similarly, perhaps some later ordinance will attempt to deal with the complex subject of relating minimum living space to actual occupants; in the meantime the prescribed minimum is sufficiently low to be applied generally. No matter what may be the size of the particular family the 786 feet minimum will be a significant step forward when contrasted with the plaintiff's "doll houses." Mathematical precision in the ordinance need not be attained; it is sufficient that its comprehensive provisions are reasonably calculated to achieve ends which are within the broad ambit of proper modern day zoning. *Cf. Duffcon Concrete Products, Inc., v. Borough of Cresskill,* 1 *N. J.* 509 (1949); *Guaclides v. Englewood Cliffs, supra.*

Finally the point has been made that the ordinance does not comply with the requirement in *R. S.* 40:55–32 that reasonable consideration be given to the character of the district and its peculiar suitability for particular uses with a view of conserving the value of property. The ordinance does not seek to convert a business district into a residential district, as in *Scarborough Apartments, Inc., v. City of Englewood,* 9 *N. J.* 182 (1952), nor does it do violence to any of the existing neighborhoods. On the contrary, it simply seeks to preserve and improve the acknowledged residential character of the entire community. See *Guaclides v. Englewood Cliffs, supra.* The improvement will conserve property values (*cf. Sayre, supra;* 50 *Col. L. Rev.* 201, 213 (1950)) and will strengthen the residential nature of every occupied neighborhood within the township including Lionshead Lake. It is inconceivable that the Legislature in *R. S.* 40:55–32 or elsewhere in the Zoning Act contemplated the frustration of these highly desirable goals. See *Greenway Homes v. River Edge,* 137 *N. J. L.* 453, 456 (*Sup. Ct.* 1948); *Birkfield Realty Co. v. Board of Com'rs. of City of Orange,* 12 *N. J. Super.* 192 (*App. Div.* 1951), certif. denied 8 *N. J.* 319 (1951).

OLIPHANT, J. (dissenting). I find I must dissent from the philosophy and the result arrived at in the majority opinion. Zoning has its purposes, but as I conceive the effect of the majority opinion it precludes individuals in those income brackets who could not pay between $8,500 and $12,000 for the erection of a house on a lot from ever establishing a residence in this community as long as the 768 square feet of living space is the minimum requirement in the zoning ordinance. A zoning provision that can produce this effect certainly runs afoul of the fundamental principles of our form of government. It places an unnecessary and severe restriction upon the alienation of real estate. It is not necessary, it seems to me, in order to meet any possible threat to the general health and welfare of the community.

182

It should be borne in mind that the threat to the general welfare and health of the community usually springs from the type of home that is maintained within the house rather than the house itself. Certain well-behaved families will be barred from these communities, not because of any acts they do or conditions they create, but simply because the income of the family will not permit them to build a house at the cost testified to in this case. They will be relegated to living in the large cities or in multiple-family dwellings even though it be against what they consider the welfare of their immediate families.

My difficulty with the provision in this ordinance is that it applies equally to every part of the 25½ square miles of this township and it applies without any regard to how the various districts of the community have been zoned. It applies to the districts classed Residence A and B, Business or Industrial Districts. While it is conceivable that some municipalities may be of such a cohesive and homogeneous character as to warrant the imposition of certain uniform regulations on the entire community, viz., the prohibition of any industrial plants in a purely residential community, *Duffcon Concrete Products, Inc., v. Borough of Cresskill*, 1 *N. J.* 509 (1949); *Struyk v. Samuel Braen's Sons*, 17 *N. J. Super.* 1 (*App. Div.* 1951), affirmed *o. b.*, 9 *N. J.* 294 (1952), the defendant township is certainly not of such character. It is sparsely settled and is made up of a group of widely separated communities or developments, and in some of these developments the minimum living floor space requirements imposed by the ordinance are easily met by all the existing dwellings while in other sections only a minority of the houses meet the standards imposed, and in the plaintiff's Lionshead Lake development only about 50% of the dwellings comply.

To impose identical living floor space minimums on all the sections of such a municipality is to fail completely to give any consideration whatever to the "character of the district and its peculiar suitability for particular purposes."

While zoning regulations may legitimately be imposed in the district to serve the general welfare by "conserving the value of property and encouraging the most appropriate uses of land," such regulations are wholly unreasonable and beyond the zoning power and an unwarranted interference with private property rights if they are designed or operate to change completely, for better or for worse, the very character of the district. Any regulation imposed must bear a reasonable relation to the particular area subject thereto. Insofar as the minimum living floor space requirements of the ordinance under review apply to the entire community and to the plaintiff's properties in particular, they are clearly arbitrary and capricious and were very properly set aside by the trial court as an abuse of the zoning power.

My views on this particular phase of zoning do not prohibit minimum floor space in a house in particular districts or a proper correlation of minimum floor space in the house and the area of the lot or lots in question, but I cannot agree with the majority when they state with respect to this minimum square footage requirements that "whether it will 'prevent the overcrowding of land or buildings' and 'avoid undue concentration of the buildings' depends in large measure on the wisdom of the governing body of the municipality." This is clearly indicative of a lack of standard with respect to this particular phase of zoning in the Zoning Act itself and it assumes that the discretion of the zoning board or governing body of a municipality amounts to wisdom. To buttress their position the majority further states: "We may take notice without formal proof that there are minimums in housing below which one may not go without risk of impairing the health of those who dwell therein." In so stating they inferentially approve certain theories advanced to sustain this ordinance by text writers and certain reports of the Department of Conservation and Economic Development. But it seems to me that the decision as to what the minimum square footage in a particular house should be is essentially within the legislative province, and the Legislature not hav-

ing spoken it is not within the power of this court or the Department of Conservation and Economic Development to attempt to supply the deficiency in the statute.

I am authorized to say that Mr. Justice Wachenfeld concurs in this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Justices OLIPHANT and WACHENFELD —2.