157 N.J. Super. 586 (1978)
385 A.2d 295
HOME BUILDERS LEAGUE OF SOUTH JERSEY, INC., A NEW JERSEY NON-PROFIT CORPORATION, AWARD HOMES, INC., A NEW JERSEY CORPORATION, CHIUSANO BROS., INC., A NEW YORK CORPORATION QUALIFIED TO DO BUSINESS IN NEW JERSEY, LINCOLN PROPERTY CO., N.E., INC., A TEXAS CORPORATION QUALIFIED TO DO BUSINESS IN NEW JERSEY, PLAINTIFFS, AND STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, SENIOR CITIZENS ADVOCATE CENTER, GRAY PANTHERS OF SOUTH JERSEY, SOUTH JERSEY TENANTS ORGANIZATION, PLAINTIFFS-INTERVENORS,
v.
TOWNSHIP OF BERLIN, BOROUGH OF PINE HILL, BOROUGH OF STRATFORD AND TOWNSHIP OF VOORHEES, ALL MUNICIPAL CORPORATIONS OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 23, 1978.
*588 Mr. Gerald E. Haughey for plaintiffs (Messrs. Brandt, Haughey, Penberthy & Lewis, attorneys).
Ms. Linda R. Hurd and Mr. Carl S. Bisgaier as co-counsel for plaintiffs-intervenors (Mr. Stanley C. Van Ness, Public Advocate of the State of New Jersey, attorney).
*589 Mr. Ronald N. Manos for defendant Township of Berlin (Messrs. Maressa & Wade, attorneys).
Mr. E. Allen Nickerson for defendant Borough of Pine Hill.
Mr. John Maroccia for defendant Borough of Stratford (Mr. John R. Bennie, attorney).
Mr. Sal B. Daidone for defendant Township of Voorhees.
TALBOTT, J.C.C. (temporarily assigned).
In this action in lieu of prerogative writs the Home Builders League of South Jersey, Inc., an incorporated, nonprofit association whose members are in the business of housing construction and related enterprises in the Camden County region; Award Homes, a New Jersey corporation, Chiusano Bros., Inc., a New York corporation qualified to do business in New Jersey, and Lincoln Property Co., N.E., Inc., a Texas corporation qualified to do business in New Jersey (hereinafter Builders) sue four municipalities in Camden County  the Borough of Stratford, the Borough of Pine Hill, Berlin Township and Voorhees Township  challenging the provisions in their zoning ordinances which require that the homes built in their towns contain certain minimum square feet. Stanley C. Van Ness, Public Advocate of the State of New Jersey, and several public interest organizations  the Senior Citizens Advocate Center, the Gray Panthers of South Jersey and the South Jersey Tenants Organization  have intervened as plaintiffs.
Each of the four defendant municipalities is in the Camden region or housing market as designated by the Supreme Court in Southern Burlington Cty. NAACP v. Mt. Laurel Tp., 67 N.J. 151, app. dism. and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975). The communities lie within a 15-mile radius of the City of Camden and within the "developing" suburban ring of the region. *590 Each community is extensively linked to the Camden-Philadelphia metropolitan area as well as other areas of the region and State by the New Jersey Turnpike, Interstate 295, Routes 30, 206 and 130, the Atlantic City Expressway and New Jersey Routes 73 and 70. The PATCO Hi-Speed Line also operates within the vicinity of each of these towns. Statistics show that each town has experienced substantial growth since 1960 and is an attractive candidate for continued growth and development.
Defendants' zoning ordinances require minimum floor space as follows:

 House Square Footage
Municipality Minimums Notes
 Highest Lowest
1. Berlin Tp. 1600 1100 The three single-family residence
 zones allow identical
 uses. They only vary in lot
 and building size requirements.
2. Pine Hill 1500 1100 Condominium and townhouse
 mins. at 1000 and 1250;
 Senior Citizen Gardens allowed
 at 450.
3. Stratford 1456 1200 House mins. vary only by
 style of house, not zone.
4. Voorhees 1600 1100 1100 and 1200 sq. foot zones
 are virtually full, thus requiring
 almost all new
 houses in town to be 1600
 sq. ft. One zone requires an
 extra 400 of floor area for
 each bedroom over three,
 others do not.

Plaintiffs allege that there is a regional demand for housing units of a smaller size than permitted by these ordinances; that the demand is pressing and urgent, and that continued delay in meeting this demand will compel those in need to suffer prolonged residence in substandard or undesirable housing or to live uneconomically in housing too *591 large for their requirements. Further, since size is the most important factor in determining housing costs, the arbitrary and unreasonably high, flat square-foot requirements price most housing out of the range of many families, especially the young, the old and the poor. The Public Advocate adds that all of these groups are in need of decent, safe and affordable housing. Builders stand ready, willing and able to construct healthful, high quality attached or detached dwellings in accordance with applicable building codes and other zoning mandates and which will be of a size and cost to meet the needs, desires and resources of this market. They contend that satisfaction of this market demand is frustrated by the arbitrary, capricious and unreasonable provisions for minimum floor space requirements in defendants' zoning ordinances which they contend are illegal as bearing no rational relationship to the health, safety, morals or general welfare of their residents or the public at large and which frustrate the statutory purposes of the recently enacted Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. Plaintiffs and plaintiff-intervenors seek either a complete elimination of square foot minimums in the ordinances, allowing the market demand to determine house size, or a reduction in defendants' floor space requirements to a minimum necessary to protect the public health, safety and general welfare.
Defendants' oppositions to those allegations vary. The Borough of Stratford contends that it is a "developed" community and, therefore, its zoning ordinance is not subject to judicial mandate for low or moderate-income housing. Voorhees Township states it has a section in its municipality with no minimum square foot requirements, so the requirement in other zones is valid. Pine Hill says it has provided its fair share of low and moderate-cost housing, so it may set minimum square foot requirements in other areas. Berlin Township states no building can take place within its borders in the foreseeable future because of water and sewerage inadequacies. All of the communities maintain that the primary *592 purpose for zoning flat square-foot requirements is to maintain the character of the neighborhoods and prevent construction of smaller houses, which could lower the property values of existing houses. In this regard they rely on Lionshead Lake v. Wayne Tp., 10 N.J. 165 (1952), app. dism. 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953).
To prove their contentions, Builders presented extensive expert testimony. Allan Mallach, a private professional planner with extensive experience with governmental and academic institutions, testified from U.S. Census Bureau figures that the average size of all households in the United States steadily decreased from an average of 3.37 persons in 1960 to 3.14 persons in 1970, with a projected continued decline to 2.17 persons by 1990. This trend is reflected in statistics for New Jersey which project that 83.6% of new households in the State between 1970 and 1990 will consist of one or two persons. See Appendix A. This decreasing household size increases the need for smaller houses, which need cuts across all economic lines. The desire for smaller houses, particularly among young people and the elderly, was practically demonstrated by two local builders, Robert S. Herskowitz and John J. Sheridan, who testified that their smaller homes are easily sold while their larger homes are sold only with difficulty.
John Rahenkamp, a nationally recognized planner, author and teacher, presented statistics to establish that the size of a house is the most important factor in the cost of construction and in the long-term cost of maintenance of that house. This was confirmed by every builder who testified for plaintiffs and by Howard Colm, a heating engineer. See Appendix B. Concomitantly, as the cost of housing increases, the number of those who can afford it decreases.
Obviously, while the impact of the increased costs of housing is experienced by all in the housing market, its greatest burden is on low and moderate-income households. Low and moderate-income households are defined by the Department of Housing and Urban Development to be families *593 earning at or below 80% of median income for a family of four. This group presently comprises approximately 43% of the Camden region's total number of households. Often these people must rely on government subsidies in order to meet their housing needs. Malach established that the minimum floor area requirements of the four municipalities preclude the construction of housing under the Farmers Home Administration Section 502 subsidy program for home owners, 42 U.S.C.A. § 1472, as well as the HUD Section 8 rental subsidy program. 42 U.S.C.A. § 1437, et seq.
Dr. Eric W. Mood, of the Yale University School of Medicine, a renowned expert in the area of housing and health, testified that nonoccupancy-based minimum floor space requirements are unrelated to the preservation of health. Dr. Mood testified that there was no aspect of physical health advanced by a minimum floor space requirement when it was unconnected to the number of persons residing in the dwelling. The minimum requirement may meet or even exceed the space needed by a family of two or three, but be grossly inadequate for a family of five or six. Dr. Mood's testimony was specifically limited to physical health. He stated that he knew of no existing standards by which effects of space on mental health could be measured. He also stated that the American Public Health Association has adopted and recommends occupancy-based minimum floor space requirements standards based solely upon the relationship of space to the physical health of a dwelling's occupants.
Builders next attack the contention of defendants that minimum-foot requirements were necessary to preserve the character of the neighborhoods developed under these minimums. In analyzing this nebulous concept plaintiffs assert that it may be split into two separate components: economics and aesthetics. As to economics, Builders demonstrated that the introduction of smaller homes into a neighborhood of larger homes does not have an adverse effect on the value of the larger homes, contending that this is a long-standing myth upon which much post-World War II zoning is based. *594 Realtor Sapio compared the sale price of various homes of similar size and structure in neighborhoods containing only comparable homes with similarly sized homes in neighborhoods near smaller homes or apartment complexes. The houses sold for approximately the same price whether in a neighborhood of like-sized houses or where housing size differed.
As to the aesthetic component of "neighborhood character," Planner Rahenkamp and Realtor Sapio testified that the aesthetic qualities of a neighborhood are best maintained by the use of appropriate planning devices, such as lot size requirements, site plan review, environmental review, requirements relating to shade trees and vegetation, topographical requirements, ratios relating to the size of a dwelling to its lot coverage, cluster and other design flexibility regulations and proper use of materials and landscape. The expense of employing these planning devices, it was asserted, would most easily be met by a builder or resident who was able to save on construction costs by building a smaller home, suited to the needs of its occupants.
These witnesses also stated that the aesthetic qualities of a neighborhood would be enhanced by the reduction of bulk in its houses, permitting the maximum amount of open space, light and air, and the absence of a uniform size or style of house within the neighborhood.
Finally, the witnesses concluded that the character and desirability of a neighborhood were more influenced by factors such as the proximity to employment, public transportation and highways, recreation areas and the quality of construction of the houses in the neighborhood than the mere size of the houses. Small houses can be of a quality and attractiveness equal to those of larger homes. In fact, a mix of different sized homes may add to the attractiveness of a neighborhood by breaking up the monotony of similarly sized buildings. One of plaintiffs' witneses interestingly noted that the two most desirable towns in the area, Haddonfield and Moorestown, have no minimum square-foot requirements in *595 their zoning ordinances, with the result that most of their neighborhoods contain houses of varying styles and sizes.
Most of Builders' expert testimony was uncontradicted by the challenged municipalities. In defense they generally claim that they have met their fair share of the region's low and moderate-housing needs as required by Mt. Laurel, supra, and that the failure of plaintiffs and plaintiff-intervenors to disprove this allegation is fatal to their case. However, this is not a challenge to the municipalities requiring them to provide low and moderate-income housing as in Mt. Laurel. This challenge cuts across economic lines. All persons, regardless of income, should be free to build the size of house best suited to their needs. This principle does not apply only to developing communities. If only one additional house is to be built, it should meet the needs of its owner as to size. The municipalities' defense does not meet Builders' contention that these ordinances are an arbitrary, capricious and unreasonable exercise of the municipalities zoning power. The only defense presented to the statutory challenge was the previously mentioned contention that the ordinances are necessary for the preservation of the character of neighborhoods. Defendants have simply asserted this contention. They have not proved it. Their only witness, a professional planner employed by Berlin Township to draw up its master plan, concluded his testimony by stating that he would not recommend minimum square-foot requirements in that plan unless based upon the number of occupants.
Land use regulation is a function of the State's police power. N.J. Const. (1947), Art. IV, § VI, par. 2, authorizes the legislative delegation of power in this area to the municipalities. The Legislature has exercised that authority and N.J.S.A. 40:55D-1 et seq. provides the statutory basis enabling municipalities to regulate land use within their borders.
A municipality's zoning ordinance or any part thereof "shall be liberally construed in [its] favor," Art. IV, § VII, par. 11, and is entitled to a presumption of validity. Pascack *596 Ass'n Ltd. v. Washington Tp. Mayor & Counc., 74 N.J. 470 (1977); Kozesnik v. Montgomery Tp., 24 N.J. 154 (1957); Vickers v. Gloucester Tp. Comm., 37 N.J. 232 (1962), cert. den. and app. dism. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963).
On the other hand, an ordinance may be struck down if it is found to be arbitrary, capricious or unreasonable. Bow & Arrow Manor v. West Orange, 63 N.J. 335 (1973); Kozesnik v. Montgomery Tp., supra; Moyant v. Paramus, 30 N.J. 528 (1959). Further, there must be a substantial relation between the restraints placed upon the use of the land and the public health, safety or welfare "in one or more of the particulars involved in the exercise of the use-zoning process specified in the statute." Pascack Ass'n Ltd. v. Washington Tp. Mayor & Counc., supra 74 N.J. at 483. See also, Delawanna Iron & Metal Co. v. Albreacht, 9 N.J. 424 (1952). The purposes of zoning are outlined in the Municipal Land Use Law, N.J.S.A. 40:55D-2, passed by the Legislature in 1976. Thus, the task of the court is to examine the challenged ordinances in the light of applicable case law and the purposes of zoning outlined in the enabling act to determine if, in fact, the provisions for minimum space requirements are an arbitrary, capricious or unreasonable use of the municipalities' power.
A review of the history of floor space requirements in New Jersey law must begin with the leading case upon which defendants rely, Lionshead Lake, Inc. v. Wayne Tp., supra. In a suit against Wayne Township a builder challenged the minimum floor space requirements of a large but relatively sparsely populated municipality, a summer resort experiencing year-round housing growth pressures so prevalent immediately after World War II. The builder had constructed about 100 houses when the township rezoned to require a minimum floor space of 768 square feet for a one-story dwelling, 1000 square feet for a two-story dwelling and 1,200 square feet for a two-story dwelling without attached garage. The trial court's decision holding the minimum *597 square footage requirements unconstitutional was reversed by our Supreme Court. In deciding that the ordinance was a reasonable exercise of the municipality's power, the court held that the township could properly consider the fact that expansion and development were approaching and could enact ordinances designed to prevent "suburban blight." The court determined that the application of the ordinance to the fact situation presented was not unreasonable because it was designed to protect land values against the deterioration that would occur if small houses were built. The court said that "without some such restrictions, there is always the danger that after some homes have been erected giving a character to a neighborhood others might follow which would fail to live up to the standards thus voluntarily set". A concurring opinion relied heavily on expert testimony produced at trial that such requirements were necessary to protect the public health.
Lionshead Lake engendered a great amount of academic discussion, much of it critical.[1] Scholars criticized the court's approval of the use of "snob zoning" for the purpose of maintaining property values. It was also argued that the use of a sliding scale of floor space requirements which were unconnected to occupancy belied any concern for public health. Finally, it was argued that there was no correlation between building size and "suburban blight."
In Pierro v. Baxendale, 20 N.J. 17 (1955), the Supreme Court acknowledged the criticism of the decision in Lionshead Lake and admitted its willingness to modify its position *598 in future cases if conditions could be shown to have changed.
We are aware of the extensive academic discussion following the decisions in the Lionshead and Bedminster cases, * * * and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation which even the more traditional modes of zoning entail. * * * In the light of existing population and land conditions within our State these powers may fairly be exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed. [at 29]
In Kirsch Holding Co. v. Manasquan Bd., 59 N.J. 241 (1971), the court, without specifically referring to Lionshead Lake, discussed the use of minimum space requirements as a zoning device. Kirsch involved a challenge to the validity of local ordinances which prohibited the "group rental" of seashore living accommodations. Though sympathetic to the problem the ordinance was designed to correct, the Court struck it down as sweepingly excessive and, therefore, legally unreasonable. In attempting to suggest a proper method to accomplish what the borough sought, the court recommended the use of occupancy-based minimum floor space requirements. In making this recommendation the court referred to two articles by Professor Charles Haar which were strongly critical of the nonoccupancy-based minimum floor space requirements approved in Lionshead Lake. Haar, "Zoning for Minimum Standards: The Wayne Township Case," supra at 1051:
* * * Minimum requirements as to dwelling size, however, accomplish none of the traditional purposes of the zoning power. * * *
Of course, there are minimums in housing below which the health of occupants suffers, the need for light, air, sunshine, and minimum space is recognized by `civilized people all over the world.' And who can oppose the concept of everyone living in a big house? But, if it is to have a purpose, a minimum size standard should be drafted in terms of occupancy. A minimum of 760 square feet has no significance for the health, sanitation, safety, morals or welfare of the *599 inhabitants if ten or twelve people live in the dwelling at the same time; on the other hand, 300 square feet for one or two persons may prove to be a desirable standard. * * *
Additional commentary on minimum space requirements is found in the recent case of Sente v. Clifton Mayor and Counc., 66 N.J. 204 (1974). While the court held the issue moot and therefore rendered no decision, Justice Hall said:
We assume that government may legitimately require a minimum floor area for living units based on the number and character of the occupants in the interest of public health and that such power has been delegated to municipalities in this state by N.J.S.A. 40:48-2. The real questions with respect to any such regulation are whether the minimums prescribed are legally reasonable, and if so, whether the regulation was actually adopted for health reasons and not for some other purpose. As previously indicated, regulations of this kind drastically affect the availability of housing, especially for large families of poor or modest means, like plaintiff's as to whom there is undoubtedly a general severe shortage of decent, suitable living accommodations. [at 208; emphasis supplied]
Justice Hall then pointedly suggested that the burden of justification of nonoccupancy-based floor space requirement ought to rest on the municipality and that the standard for such justification should be a "realistic individual health hazard" presenting a "substantially certain public health problem." Id. at 208.
In the Mt. Laurel case the court criticized as overly restrictive the nonoccupancy-based minimum floor space requirements. The minimum requirements in Mt. Laurel were similar to those faced here: 1,100 square feet for all one-story dwellings and 1,300 square feet for all dwellings above one-story. The court said of these requirements:
* * * As to building size, the township's general requirements of a minimum dwelling floor area of 1,100 square feet for all one-story houses and 1,300 square feet for all one and one-half stories or higher is without regard to required minimum lot size or frontage or the number of occupants (see, Sente v. Mayor and Municipal *600 Council of City of Clifton, 66 N.J. 204, 208-209 (1974)). In most aspects these requirements are greater even than those approved in Lionshead Lake, Inc. v. Township of Wayne, supra, 10 N.J. 165, almost 24 years ago and before population decentralization, outer suburban development and exclusionary zoning had attained today's condition. See also Williams and Wacks, Segregation of Residential Areas Along Economic Lines: Lionshead Lake Revisited, 1969 Wisc. L. Rev. 827. Again, it is evident these requirements increase the size and so the cost of housing. The conclusion is irresistable that Mt. Laurel permits only such middle and upper income housing as it believes will have sufficient taxable value to come close to paying its own governmental way. [67 N.J. at 183-184]
The conclusion to be drawn from this review of post-Lionshead Lake decisions is that while Lionshead Lake has not been expressly overruled, it cannot be viewed as dispositive of this case. Supreme Court dicta in several cases cited above reflect an attitude of acceptance of minimum square-foot requirements only if they are occupancy based. Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra; Sente v. Clifton Mayor and Council, supra, Kirsch Holding Co. v. Manasquan Bd., supra. Two other reasons for finding that Lionshead Lake need not be followed today are the change in 1976 in the enabling statute covering municipal land use regulation, changing the goals and purposes of zoning, and the fact that the minimums challenged here are significantly greater than those approved in Lionshead Lake.
The preservation of property values, the primary basis for the holding in Lionshead Lake, was valid in 1953, since at that time the enabling statute N.J.S.A. 40:55-32 provided in part:
* * * Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property. * * *
However, in response to the mandate of the Mt. Laurel decision, the Legislature in 1976 enacted a new Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. The provision, *601 quoted above, is conspicuously absent from the purposes enumerated in the new act. N.J.S.A. 40:55D-2. In view of this change the municipalities' defense that the ordinances should be upheld as necessary to the preservation of the character of neighborhoods and conservation of property values is not valid today.
One purpose of zoning which is recognized in the new act, N.J.S.A. 40:55D-2, is the encouragement of municipal action to promote the public health. Plaintiffs have shown that no interest of public health is advanced through the use of nonoccupancy-based minimum standards. An obvious flaw in any argument in favor of the health rationale is the fact that different standards exist for different parts of each town. It is ridiculous to suggest that an 1,100 square foot house may be "healthful" in one part of town and not another.
The statute also encourages municipalities to regulate the use of their land so as to provide adequate light, air, open space and appropriate population densities. Obviously, the larger the buildings on a given lot size, the less light, air and open space there is. The regulation of building size without regulation of the number of occupants does little to control population densities. This also relates to the promotion of the conservation of natural resources. The construction of larger homes requires greater use of building materials and greater amounts of fuel to heat those homes. This increases the costs of constructing and maintaining these homes and is contrary to the statutory purpose of reducing the cost of land development.
Plaintiffs have carried the burden of showing that flat square-foot minimums in zoning ordinances advance none of the purposes of zoning, and, in fact, frustrate many of these purposes. Defendants have failed to rebut this testimony and have introduced no evidence of their own which would advance any legal basis for this requirement in their ordinances. The only result apparent to this court is the unnecessary *602 raising of housing costs with the concomitant effect of reducing the affordability of housing to large segments of our population.
The fact that minimum space requirements serve to exacerbate the housing shortage demonstrated by plaintiffs at trial, without advancing a single desirable social goal, leads inescapably to the finding that these ordinances are an exercise in "snob zoning" and amount to an arbitrary, capricious and unreasonable exercise of the municipalities' zoning power.
The conclusion that nonoccupancy-based minimum floor area requirements are an invalid exercise of a municipality's zoning power rests on statutory grounds. The intervenors have contended that these ordinances be struck down on constitutional grounds in addition to the statutory grounds. This contention is based on the Mt. Laurel decision. The argument, simply stated, is that since the towns are "developing" municipalities, as that term is defined in Mt. Laurel, and because the challenged ordinances go beyond what "least cost" housing would require (see Oakwood at Madison v. Madison Tp., 72 N.J. 481), costs are artificially inflated, effectively depriving a needy class of citizens from housing opportunities. Therefore, following Mt. Laurel, minimum space requirements should be declared unconstitutional. Because of the disposition of this case on statutory grounds, it is unnecessary to decide this claim of unconstitutionality.
A final task is to specify the remedy to be afforded plaintiffs. A court does not enact ordinances; local legislatures do. As the court recently said in Pascack Ass'n Ltd. v. Washington Tp. Mayor & Counc., supra:
* * * it is not for the courts to substitute their conception of what the public welfare requires by way of zoning for the views of those in whom the Legislature and the local electorate have vested that responsibility. The judicial role is circumscribed by the limitations *603 stated by this court in such decisions as Bow & Arrow Manor and Kozesnik, both cited above. In short, it is limited to the assessment of a claim that the restrictions of the ordinance are patently arbitrary or unreasonable or violative of the statute, not that they do not match the plaintiff's or the court's conception of the requirements of the general welfare, whether within the town or the region. [74 N.J. at 485]
Plaintiffs have requested that the court establish the Minimum Property Standards of the U.S. Department of Housing and Urban Development or that standards set forth in the New Jersey State Housing Code as the proper minimum floor space standard be used. This the court will not do. That responsibility is solely within the province of the municipalities. The court simply declares that the sections of the ordinances requiring minimum square feet, since they are not based upon occupancy, are invalid. Defendants have 90 days from the date of this decision to amend their ordinances to base this requirement on occupancy if they so desire. If this is not done, the sections of the ordinances requiring square-foot minimums shall thereafter be null and void.
APPENDIX A

 TABLE 2(b): DISTRIBUTION OF HOUSEHOLDS BY SIZE
 1970 TO 1990
 number of number of number of percentage
 households households households distribution
 in 1970 in 1990 added each of households
 year added
 1 member 384,759 730,939 17,309 44.8%
 2 members 611,046 910,378 14,967 38.8%
 3 members 394,268 516,450 6,109 15.8%
 4 members 376,285 428,078 2,590 6.7%
 5 members 236,619 244,595 399 1.0%
 6 members 122,719 97,389 - 1,267 - 3.3%
 7 or more members 97,872 67,941 - 1,497 - 3.9%
 SOURCE: U.S. Census of Population 1970 and projection by Alan
 Mallach/Associates

*604
 APPENDIX B
 COST OF OWNERSHIP
 THRESHOLD COSTS MONTHLY CARRYING COSTS
 HOUSE
 SIZE PROPERTY DOWN OIL
 S.F. COST PAYMENT[*]MORTGAGE TAXES INS. UTILITIES TOTAL
 800 $26,500. $4,000. $201.22 $66.25 $5.89 $18.86 $292.02
 1,008 $30,000. $4,500. $227.57 $75.00 $6.67 $21.43 $330.67
 1,204 $33,500. $5,000. $254.11 $83.75 $7.58 $24.00 $369.44
 1,400 $36,000. $5,500. $273.08 $90.00 $8.58 $26.03 $397.69
 1,600 $39,500. $6,000. $299.63 $98.75 $9.58 $28.02 $435.98

NOTES
[1] See, e.g., Haar, "Zoning for Minimum Standards: The Wayne Township Case," 66 Harv. L. Rev. 1051 (1953); "Zoning for Whom  In Brief Reply," 67 Harv. L. Rev. 986 (1954); Nolan and Horack, "How Small a House-Zoning for Minimum Space Requirements," 67 Harv. L. Rev. 967 (1954); 2 Williams, American Planning Law 637; "Planning Law and Democratic Living," 20 Law and Contemp. Prob. 317 (1955); Williams and Wacks, "Segregation of Residential Areas Along Economic Lines: Lionshead Lake Revisited," 1969 Wisc. L. Rev. 827 (1969).
[*] Including settlement costs, 90% financing @ 8.75% for 25 years plus 1/4 of 1% premium for mortgage insurance.