21 N.J. Super. 605 (1952)
91 A.2d 510
ROBERT E. HARRISON, PLAINTIFF-APPELLANT,
v.
TOWNSHIP OF LONG BEACH, A MUNICIPAL CORPORATION, AND HOWARD E. SHIFLER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1952.
Decided October 9, 1952.
Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Albert B. Melnik argued the cause for the plaintiff-appellant.
*606 Mr. Franklin H. Berry argued the cause for the defendants-respondents (Messrs. Berry, Whitson & Berry, attorneys; Mr. Maja Leon Berry, of counsel).
On appeal from the final judgment of the Superior Court, Chancery Division, in which court the following opinion was filed by Judge McLEAN:
"Final hearing in this cause was had before me on May 8, 28 and 29 last and counsel were advised on August 8 last that the complaint would be dismissed in favor of the defendants except that by consent of the parties the restraint against further action with respect to Lots 17 and 19 [18] in Block 432 [433], on map of Brighton Beach, already imposed would be made permanent. Judgment accordingly was thereafter entered. From the judgment of dismissal an appeal has been taken and I am, therefore, filing this memorandum to state the reasons for my decision.
"By the complaint filed herein plaintiff sought to enjoin the defendants, the Township of Long Beach, and its mayor from demolishing or interfering with buildings designed for dwelling purposes and erected on Lots 17 and 18 in Block 433 and on Lots 6 and 7 in Block 432, Brighton Beach in said township. Before the complaint was filed the building on Lots 6 and 7 in Block 432 was actually demolished pursuant to the provisions of Long Beach Township Ordinance No. 169 and proceedings thereunder. Upon the filing of the complaint and the service of an order to show cause with restraint, the defendants' attorney advised plaintiff of the demolition of the building on Lots 6 and 7 and that he would consent to a permanent restraint against the demolition of the building on Lots 17 and 18. The plaintiff thereupon amended his complaint by setting out the fact of demolition of the one building and asking damages of $8,000 for the building and $12,000 for personal property alleged to have been contained therein.
"By their answer the defendants admitted the demolition of the building on Lots 6 and 7, and justified it by stating *607 that it was done pursuant to proceedings under an ordinance of the township enacted pursuant to statute and that the plaintiff had due and legal notice thereof. At the final hearing the defendants' attorney stated that he had already advised plaintiff's attorney that he would consent to the entry of a judgment enjoining the defendants from demolishing the building on Lots 17 and 18 and such a consent judgment was subsequently entered.
"The facts disclosed and fully supported by a preponderance of the evidence, as I find them, are as follows:
"In 1942 the plaintiff began erection of a dwelling house on beach front Lots 6 and 7 in Brighton Beach owned by him. The building was enclosed and rough flooring was laid, but no stairway to the second floor, no plumbing and no electrical wiring had been installed. The building was constructed of second hand lumber and the sheathing and flooring were of rough packing box boards. A considerable quantity of second hand furniture, plumbing material and fixtures, electrical fixtures and refrigerators, etc., was stored therein but the building was far from complete and not fit for human habitation. It stood unoccupied until it was undermined during the September 1944 hurricane and toppled over on to the beach along the ocean front. There it remained for a long time, and until it was partly righted and cribbing or blocking put under it on the ocean side thereof, and the building was raised up and supported by jack-screws. Some makeshift concrete piling, poured into 8-inch tin stove pipe, were put in place to help support the building. When the building was righted it became necessary to tear the shingles off its sides, because the frame of the building had buckled and twisted. These shingles were never replaced. Most, if not all, of the windows were broken out and boarded up, but not sufficiently to make the inside of the building weatherproof. Consequently everything contained in the building became damaged, rusty and rotten  the floors and joists were rotted out in places. The place was infested with rats. A deep hole was made under the house by winds and waves *608 so that water collected therein to a depth of six or eight feet. A little girl narrowly escaped drowning in this pool. The building was precariously supported by the blocking, jacks and other under-pinning and was in grave danger of toppling over again. Repeated efforts of the township officials to persuade the plaintiff to complete the building and to abate the menacing nuisance, were unavailing. The condition of the property became the subject of numerous complaints by neighboring residents of the township. These complaints finally, in 1949, took the form of a petition signed by 18 neighboring residents and property owners, and addressed to the township commissioners requesting that the owner of the building be compelled to complete it or that it be demolished upon the ground that it was dangerous, an eyesore, and a detriment to surrounding properties and to further development of real estate in the immediate vicinity. After the receipt of this petition, the township officials continued their efforts to induce the plaintiff to complete the building, but without avail. No material improvement having been made since the hurricane of 1944, a period of almost six years, the defendant mayor, as Director of Public Affairs and Safety, on April 25, 1950 filed with the township commissioners a formal complaint addressed to the plaintiff, charging him with maintaining a dwelling house on Lots 6 and 7 in Block 432 which was unfit for human habitation, in violation of the provisions of Ordinance No. 169 of the Township of Long Beach, which ordinance was entitled, `An Ordinance of the Township of Long Beach, in the County of Ocean, to Provide for the Repair, Closing or Demolition of Dwellings Unfit for Human Habitation and Providing for the Removal or Remedying of Conditions Otherwise Dangerous to the Health and Safety of Residents of This Municipality, and Providing Penalties for the Violation Hereof.' That ordinance had been duly adopted by the township commissioners on August 19, 1949, pursuant to the authority contained in L. 1942, chapter 112, (N.J.S.A. 40:48-2.3 to 2.12 inclusive). The procedure outlined in the ordinance, and which was strictly *609 followed in this matter, is in the language of the statute. Due and legal notice of a hearing on this complaint was given to the plaintiff for May 6, 1950 at the Municipal Building at Brant Beach in the Township of Long Beach at 10:00 A.M. On May 4 the plaintiff's Philadelphia attorney wrote to the mayor asking for a two weeks' postponement of the hearing which, in view of past experience with the plaintiff, was refused. The hearing was duly held by a commissioner designated for that purpose by the mayor, as Director of Public Affairs and Safety, who thereupon filed findings of fact in writing to the effect that the dwelling maintained by the plaintiff on Lots 6 and 7 in Block 432 was unfit for human habitation; that the house had never been completed, and that proper repair or improvement of the dwelling could not be made at reasonable cost in relation to its value. Thereafter, on May 23, 1950, pursuant to the provisions of the said statute and ordinance, the mayor, as Director of Public Affairs and Safety, issued his order directing the plaintiff to remove or demolish said dwelling house within 30 days from the date thereof. These findings of fact and the order were duly served on the plaintiff. The time limit fixed by the order directed to the plaintiff was later extended for one week at plaintiff's attorney's request, and on his promise that the plaintiff would put the house in good condition. This he did not do (in fact, plaintiff testified that he had not been down to his property between March of 1950 and the first day of the trial), and the township commissioners then employed a contractor to demolish the building, which he agreed to do for what lumber he could salvage therefrom. He was instructed by the commissioners to take out of the building whatever personal property stored therein was of any value and put it in the other house and garage owned by the plaintiff, and this was done. The house was demolished and the contractor sold the salvaged lumber for $100, which was insufficient to pay the costs of the labor employed in the work. The deficit in this cost was made *610 up by voluntary contributions by owners of neighboring properties.
"The plaintiff claimed the building had cost him $3,500 but the testimony of four competent and reliable builders was to the effect that it was of no value whatever at the time of the hearing and subsequent demolition. These builders all agreed that the lots would be worth more without the building. I accept their testimony as proof of the fact that the building was of no value at the time of its demolition.
"The plaintiff's testimony as to the value of the furniture and materials in the building I consider totally unreliable. This property consisted of second-hand and salvaged articles and building materials which plaintiff had acquired from time to time and removed to the building, seemingly for storage; for example, a quantity of used lumber had been brought from buildings being demolished in Philadelphia. He admitted that he had not seen some of the contents of this building for seven years. Other evidence indicated to my satisfaction that this personal property had been left exposed to the elements so long that most of it was entirely worthless in May 1950, and what was of any value at all was taken care of and put in plaintiff's other house and garage. Plaintiff stressed that the upper portion of a large cabinet and its veneer had been bruised and damaged in the moving. It is more likely that this was damaged when the house toppled over in 1944.
"I am satisfied that the plaintiff suffered no damage.
"There was ample authority under the statute and ordinance referred to for the acts of the defendants complained of by the plaintiff. Obviously, the defendants were acting under the police power of the municipality.
`* * * And where the public interest is involved, preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property.' Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928).
*611 "The township ordinance here involved was enacted pursuant to the provisions of L. 1942, chapter 112, page 378 (N.J.S.A. 40:48-2.3 to 2.12, inclusive). The preamble to that act of the Legislature, as contained in section 1 of the act (N.J.S.A. 40:48-2.3), is both interesting and informative. It reads as follows:
`Unfit dwellings in municipalities; exercise of police power authorized.
It is hereby found and declared that the existence and occupation of dwellings in municipalities of this State which are unfit for human habitation are inimical to the welfare and dangerous and injurious to the health and safety of the people of this State, and that a public necessity exists for the repair, closing or demolition of such dwellings. Whenever any municipality of this State finds that there exists in such municipality dwellings which are unfit for human habitation due to dilapidation, defects increasing the hazards of fire, accidents or other calamities, lack of ventilation, light or sanitary facilities, or due to other conditions rendering such dwellings unsafe or insanitary, or dangerous or detrimental to the health or safety or otherwise inimical to the welfare of the residents of such municipality, power is hereby conferred upon such municipality to exercise its police powers to repair, close or demolish the aforesaid dwellings in the manner herein provided.'
"That act expressly conferred upon the defendant municipality the police power which was here exercised.
"It is contended on behalf of plaintiff that the sole authority for the adoption of the ordinance here involved was N.J.S.A. 40:48-1. But that is not so. General authority to make and enforce ordinances for various purposes is conferred by N.J.S.A. 40:48-1, including the exercise of the police power in certain instances. The power there given might conceivably extend to the present controversy, but it is not necessary to now decide that question, for specific authority for defendants' acts is expressly given in L. 1942, chapter 112. The validity of such legislation is not open to question. In Vanderhoven v. Rahway, 120 N.J.L. 610 (Sup. Ct. 1938), it was held that `the right of the state, or of its right to delegate the power to a municipality, to exercise its police power to take or destroy private property in a *612 summary manner when necessary for the safety of the public' cannot be doubted."
PER CURIAM.
The judgment under review is affirmed, for the reasons expressed in the opinion filed in the Superior Court, Chancery Division.
Plaintiff quotes at length from Vanderhoven v. Rahway, 120 N.J.L. 610 (Sup. Ct. 1938) and appears to rely upon it. The court's quotation from that case is, of course, a correct statement of the law. However, the action taken by Rahway was held invalid because notice was not given the owner of the intention to remove the condemned buildings there in question. The distinction between Vanderhoven v. Rahway and this case is obvious. As was pointed out in the opinion of the Chancery Division, the action here taken was expressly and specifically authorized by L. 1942, c. 112. Due and legal notice was given, as required by the statute (N.J.S.A. 40:48-2.7) and by section 12 of the ordinance. Receipt of the notice by plaintiff's wife while he was away on a trip is admitted.
Every step taken by the municipality in this case was in strict accord with the requirements of the statute and of the ordinance, whose provisions embody the language of the statute almost word for word, with the exception of its preamble (N.J.S.A. 40:48-2.3) and the sections respectively dealing with remedies and the administration of an ordinance (N.J.S.A. 40:48-2.8 and 2.10).