STEVEN SENTE, PLAINTIFF-APPELLANT, v. THE MAYOR AND MUNICIPAL COUNCIL OF THE CITY OF CLIFTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND WILLIAM WALTERS, HOUSING DIRECTOR, DEFENDANTS-RESPONDENTS.

Argued May 20, 1974—Decided December 12, 1974.

*Mr. Peter A. Buchsbaum* argued the cause for plaintiff-appellant.

*Mr. Arthur J. Sullivan, Jr.* argued the cause for defendants-respondents.

The opinion of the Court was delivered by

HALL, J. ██ This case is long since moot. While we may determine a moot appeal when the public interest in the issue presented is so great as to make a resolution of it desirable, *Busik v. Levine,* 63 *N. J.* 351, 364 (1973), appeal dismissed 414 *U. S.* 1106, 94 *S. Ct.* 831, 38 *L.Ed. 2d* 733 (1973), we should not do so when, as here, the record and contentions on a novel and very far-reaching question are so unsatisfactory that we cannot be confident of reaching the correct result.

The action, in lieu of prerogative writ, commenced in the Law Division in 1970, sought a declaration of invalidity of a police power ordinance of the city of Clifton requiring a certain minimum floor area for each dwelling unit based on the number of occupants. The enactment then required 150 square feet of floor space for each of the first two occupants and an additional 100 square feet for each additional occupant regardless of age. The prohibition of the ordinance extended to any person occupying, or letting to another for occupancy, any dwelling or dwelling unit which did not comply. Prior to 1964, the ordinance required only 120 square feet for the first occupant and 80 square feet for each additional occupant, except that only 60 square feet was

needed for each child under six years of age. By amendment in that year, the requirement for the first occupant was raised to 150 square feet and 100 square feet for each additional occupant, irrespective of age. An amendment in 1970 raised the requirement for the second occupant to 150 square feet.

Plaintiff was employed as superintendent of a garden apartment complex and received the use of an apartment rent-free as part of his compensation. His family consisted of his wife and five children. The apartment was not large enough to meet the requirements for a living group of that size. Plaintiff was threatened by municipal officials with enforcement of the ordinance against him, which would mean he would not only have to vacate the apartment, but give up his job. The suit followed.

The trial court sustained the enactment, without a trial, by granting defendants' motion for summary judgment.[1] While plaintiff's appeal was pending unheard in the Appellate Division, he was discharged from his position and so required to vacate the apartment. The family moved to another municipality in October 1972 and obviously plaintiff no longer has any real interest in Clifton's ordinance or litigation attacking it. The action, which thereby became moot, has since been carried on in plaintiff's name by a civil liberties organization (which arranged counsel for him originally) having no standing itself. Such included continuation of the appeal in the Appellate Division, resulting in an affirmance of the trial court, 123 *N. J. Super.* 274 (1973), and the prosecution of the present appeal to this court, which was brought on the claim of involvement of a substantial constitutional question. *R.* 2:2–1(a)(1).

Regulations basing minimum floor area requirements of a dwelling unit on the number of occupants apparently have

---

[1] Planitiff's cross-motion was denied except that a section of the ordinance giving municipal officials free access to all dwelling units, without a warrant, to inspect the same for ordinance compliance was declared unconstitutional as violative of the Fourth Amendment.

never previously been passed upon by an appellate court. The only case that can be found on the subject is a trial court opinion in Ohio, *Nolden v. East Cleveland City Commission,* 12 *Ohio Misc.* 205, 232 *N.E.* 2d 421 (1965), which sustained a comparable enactment, having, however, certain ameliorating aspects.

The instant ordinance affects a fundamental for living — housing — very drastically. Not only must an apartment tenant vacate if the birth of an additional child or the arrival of an aged relative causes the minimum required floor area to be exceeded, but the owner of a single-family dwelling must likewise move his family from their own home if such an event occurs. The minimum figures are such that mobile homes and two person occupancy of a one-room apartment are impossible. And no distinction is made with respect to the age of the occupants; young children and possibly elderly people may well need less living space. Moreover, since this regulation is grounded in the general police power and not as part of the municipality's zoning ordinance, under the law of this state to date it applies to all dwelling units as of the moment of passage and there is no protection to a nonconforming unit. In addition, for the same reason, there is no possibility of obtaining any alleviation. The regulation in the Ohio case cited was at least subject to these ameliorative features.

Turning to the factual and legal contentions and the record, the case was, as we have said, decided in the Law Division on motion without a trial. Plaintiff offered no substantial evidence and rested on abstract federal constitutional propositions largely of little relevance. These included claims of violation of due process and equal protection by burdening the exercise of fundamental rights without a compelling state interest, such as the right to privacy, the right to procreate,[2]

[2]See *Cleveland Board of Education v. La Fleur,* 414 *U. S.* 632, 94 *S. Ct.* 791, 39 *L. Ed.* 2d 52 (1974), holding invalid compulsory maternity leaves for teachers at a prescribed point in pregnancy, not referred to by the parties.

the right to marry, the right to the free exercise of religion, and the right not to be uprooted, as well as by discrimination against large families, the poor and racial minorities. The municipality relied on the conclusional affidavit of its local health officer, as a purported expert (he was not even cross-examined), in support of the legal propriety and reasonableness of the regulation. The arguments on appeal follow the same tack.

We assume that government may legitimately require a minimum floor area for living units based on the number and character of the occupants in the interest of public health and that such power has been delegated to municipalities in this state by *N. J. S. A.* 40:48-2. The real questions with respect to any such regulation are whether the minimums prescribed are legally reasonable, and if so, whether the regulation was actually adopted for health reasons and not for some other purpose. As previously indicated, regulations of this kind drastically affect the availability of housing, especially for large families of poor or modest means, like plaintiff's, as to whom there is undoubtedly a general severe shortage of decent, suitable living accommodations. The record indicates this is true in Clifton.

The consequences being so great in so fundamental an area, perhaps justification for the particular enactment ought to rest upon the municipality. See *Moyant v. Paramus,* 30 *N. J.* 528, 535 (1959). Indeed, the legal reasonableness of a regulation of this kind might depend upon proof that every person enjoying less than the particular prescribed minimum amount of living space necessarily encounters a realistic individual health hazard and presents a substantially certain public health problem. (It may be noted that the Clifton minimums are, in one respect at least, higher than suggested in the proposed model housing codes relied upon in the affidavit.) A municipal enactment should neither be struck down nor validated when, as here, truly vital aspects have not been presented or considered.

Furthermore, the absence of any exploration at the trial level of why this ordinance or its predecessors was adopted makes one wonder what was the real reason for passage. The health officer's affidavit did not say that health was the reason and the progressive increases in the minimum suggest the possibility of some other motivation. Judicial notice can be taken of the fact that Clifton is adjacent to the cities of Paterson and Passaic, both of which have substantial and increasing numbers of poor families predominantly from minority groups, which might be expected naturally to spill over into Clifton. Such families are frequently large and cannot afford expensive quarters, but still need extensive municipal services. The Clifton ordinance will effectively wall them out of the municipality. The city should be required to establish that it was not enacted for any such improper purpose.

For all of the reasons mentioned, we should not decide this moot appeal nor should the Appellate Division have entertained it. It is dismissed and the judgment of the Appellate Division is vacated. No costs.

PASHMAN, J. (dissenting). The majority now concudes that this case is moot. The majority does not contend that this conclusion is compelled by the doctrine of mootness on appeal. It necessarily concedes that this Court can and often has decided factually moot cases of public interest. *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N. J.* 17, 21 (1973); *Busik v. Levine,* 63 *N. J.* 351, 364 (1973), appeal dismissed 414 *U. S.* 1106, 94 S. Ct. 831, 38 L. Ed. 2d 733 (1973); *John F. Kennedy Memorial Hospital v. Heston,* 58 *N. J.* 576, 578 (1971); *Bd. of Ed. E. Brunswick Tp. v. Coun., E. Brunswick,* 48 *N. J.* 94, 109 (1966); *State v. Perricone,* 37 *N. J.* 463, 469 (1962), *cert.* denied, 371 *U. S.* 890, 83 S. Ct. 189, 9 L. Ed. 2d 124 (1962); Annotation, "Public interest as a ground for refusal to dismiss an appeal, where question has become moot, or dismissal is sought by one or both parties," 132 *A.L.R.* 1185 (1941). Nor does the majority suggest that the issues presented for consideration here are not of public

interest. Indeed, it takes the remarkable position that this case should not be decided for the very reason that the questions are "novel and very far reaching." *Ante* at 205.

The doctrine of mootness serves important interests of judicial economy and restraint. Decision of moot cases involves the risk of wasteful expenditure of judicial resources on issues of practical importance to no one, of erroneous or overgeneralized opinions caused by the absence of the vigorous adversary advocacy necessary to focus questions of fact and of law and to bring to the court's attention all the ramifications of the issues. It also involves the creation of unnecessary constitutional precedents which limit the flexibility of subsequent action by courts and legislature. Against these considerations must be balanced the interest of the judicial system in avoiding repeated relitigation of the same issues and, of most important weight, the interest of the people in having issues of public importance given prompt and definitive resolution.

The position of this Court was enunciated most clearly by Chief Justice Weintraub in *Busik v. Levine,* 63 *N. J.* 351 (1973):

\* \* \* [T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may express doubts upon existing doctrines, thereby inviting litigation, or may itself raise an issue it thinks should be resolved in the public interest, or may deliberately decide issues which need not be decided when it believes that course is warranted. So a court may decide an issue even though the litigation has become moot, again in the public interest \* \* \*. [at 363–364; citations omitted].

The balance in this case clearly weighs against dismissal on grounds of mootness. The case has been fully and completely — even zealously — briefed and argued by both parties.[1] The advocacy displays no lack of adversary spirit.

---

[1] The majority appears to think that the fact that plaintiff has been represented throughout the litigation by the American Civil Liberties

The Court is not faced with the perils of deciding an abstract question or couching its opinion in terms of an unrealistic or artificial factual situation. The record displays a real set of facts, one which sharply focuses the constitutional arguments the parties have made. *Cf. Davis, Administrative Law*, § 6.14 at 274–83 (1970 Supp.).

Finally, and most significantly, this is not an idle exercise in constitutional jurisprudence. The Clifton ordinance at issue in this case substantially resembles the Model State Housing Code Ordinance developed by the New Jersey Department of Community Affairs for adoption by New Jersey municipalities. It also resembles model codes developed by the United States Public Health Service and the American Public Health Association and has significant features in common with provisions of the New Jersey State Sanitary Regulations. *N. J. A. C.* 5:10–6.3. The challenges made by plaintiff to the ordinance, whether ultimately meritorious or not, raise fundamental questions as to both the power of municipalities to act to forestall urban blight and protect the health of their residents and the constitutional limits on the means they may use to achieve those ends. These are questions which the Court ought to resolve at the earliest opportunity. In the words of Justice Brennan, "[The Court] should not transform principles of avoidance of constitutional decisions into devices for sidestepping resolution of difficult cases." *De Funis v. Odegaard*, 416 *U. S.* 312, 350, 94 S. Ct. 1704, 1722, 40 *L.Ed.* 2d 164, 188 (1974) (dissenting opinion).

---

Union has some bearing on mootness. To the credit of this organization, many significant legal matters have been prosecuted by it resulting in decisions of far reaching importance. The right of the plaintiff to be represented by such an organization and the right of such an organization to appear on his behalf, even to control the litigation and to select the issues and litigational strategy, so long as it does so with the informed consent of plaintiff, is expressly protected by the First Amendment of the federal constitution and Article I, § 6 of our Constitution of 1947. *NAACP v. Button*, 371 *U. S.* 415, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963).

Ordinarily, having registered my dissent to the decision to treat this matter as moot, I would stop at this point. In this case, however, the majority has acted in a manner which I find quite objectionable. Having first declared that this case ought not be and will not be decided, the majority then goes ahead, in effect, to comment on the merits — and not just to comment on the matter, but to do so in a fashion somewhat short of a reasoned analysis of the questions of fact and law here presented. I feel obliged, therefore, to comment at some length on the merits of this case.

Plaintiff, his wife and four children, moved to the City of Clifton in 1969, where they occupied a 4½ room apartment of approximately 600 square feet of floor space when the applicable municipal ordinance required a minimum of 650 square feet. At the time, Mr. Sente was employed as the building superintendent and received his apartment rent-free as partial compensation. Further amendments to the ordinance and the subsequent birth of a fifth child in 1970 resulted in the Sentes' apartment being 200 square feet smaller than the ordinance stipulated.

By letter dated July 1, 1970, the housing director of Clifton informed plaintiff that he was in violation of the ordinance and should vacate the premises. A subsequent letter, dated October 13, 1970, gave plaintiff a six-month grace period "because of hardship placed on larger families due to shortage of rental units." Since then, Mrs. Sente had given birth to a sixth child, late in the summer of 1972. On October 21, 1972, plaintiff and his family moved to Lodi, after being discharged as building superintendent and told to vacate his Clifton dwelling.

On December 21, 1970, plaintiff filed a complaint in lieu of prerogative writ, challenging the validity of Chapter 9, Article 3, Section 9–31(a)[2] of the Revised Ordinances of Clif-

---

[2]Chapter 9, Article 3, Section 9–31(a):

No person shall occupy or let to another for occupancy any dwelling or dwelling unit, for the purpose of living therein, which does not comply with the following requirements:

ton. Plaintiff has vigorously maintained that both the equal protection and due process clauses of the Fourteenth Amendment have been violated. To this, defendant Clifton responded that the ordinance was a legitimate exercise of police power, and was both reasonable and necessary for the public health and welfare. Clifton filed an affidavit of its health officer to this effect. The said official made it clear that in his opinion "adequate housing is directly related to public health" and, therefore, believed that the ordinance was "eminently reasonable and did not exceed a minimum standard reasonably required for the maintenance and preservation of the health of the citizens of the City of Clifton." He further indicated that the ordinance's requirements were substantially similar to those suggested in the New Jersey Housing Code, a proposed model State housing code issued jointly in 1962 by the Department of Conservation and Economic Development and the Department of Health.

Plaintiff's motion for summary judgment was denied and on defendants' similar motion, the judge gave plaintiff 60 days to present evidence demonstrating that the standards set forth in the ordinance were unreasonable. Plaintiff failed to present any such evidence, and defendants' motion was granted. As a matter of fact, plaintiff's counsel conceded at oral argument that "Mrs. Sente realizes right now that her apartment is not adequate for her and her five children."

Plaintiff's appeal to the Appellate Division proved unsuccessful; it was determined that the ordinance was authorized under *N. J. S. A.* 40:48-2, that it did not conflict with any other State law, and that plaintiff's constitutional allegations were without merit. *Sente v. Mayor & Mun. Coun. Clifton, et al.*, 123 *N. J. Super.* 274 (App. Div. 1973). Notice of ap-

---

(a) Every dwelling unit shall contain at least 150 square feet of floor space for each occupant thereof up to a maximum of two occupants and at least 100 additional square feet of floor space for every additional occupant thereof, the floor space to be calculated on the basis of the total habitable area.

peal to the Supreme Court was filed pursuant to *R.* 2:2–1(a) (1).

## I

Mr. Sente challenges the use of *N. J. S. A.* 40:48–2.3.[3] as providing the enabling authority for the present restrictive municipal ordinance. Plaintiff is generally borne out in his contention by case law delimiting the statute's parameters to the repair, closing or demolition of a building. *Harrison v. Twp. of Long Beach,* 21 *N. J. Super.* 605 (App. Div. 1952); *Lewis v. Atlantic City,* 40 *N. J. Super.* 203 (Law Div. 1956); *City of Newark v. Charles Realty Co.,* 9 *N. J. Super.* 442 (Cty. Ct. 1950). But this is an example of legislative authorization to municipalities to protect inhabitants in buildings which are unfit for use. See also *N. J. S. A.* 2A:42–74 *et seq.* These sections are designed as a means to allow municipalities to ensure that multiple dwellings adhere to minimum standards of safety. This "minimum standards" leg-

---

[3] 40:48–2.3   Unfit buildings in municipalities; exercise of police power authorized

It is hereby found and declared that the existence or occupation of any building or buildings, or parts thereof, in municipalities of this State which are so old, dilapidated or have become so out of repair as to be dangerous, unsafe, insanitary or otherwise unfit for human habitation, or occupancy, or use, are inimical to the welfare and dangerous and injurious to the health and safety of the people of this State, and that a public necessity exists for the repair, closing or demolition of such building or buildings, or part thereof. Whenever any municipality of this State finds that there exists in such municipality any building or buildings which are unfit for human habitation or occupancy, or use, due to dilapidation, defects increasing the hazards of fire, accidents or other calamities, lack of ventilation, light or sanitation facilities, or due to other conditions rendering such building or buildings, or part thereof, unsafe or insanitary, or dangerous or detrimental to the health or safety or otherwise inimical to the welfare of the residents of said municipality, power is hereby conferred upon such municipality to exercise its police powers to repair, close or demolish, or cause or require the repairing, closing or demolition of such building or buildings, or part thereof, in the manner herein provided.

islation was the starting point for the right of municipalities to enact ordinances aimed at shoring up substandard housing. The ordinance in question should be considered on the same level as any ordinance enacted pursuant to this minimum standards legislation. It is a municipal expression of compliance with the Legislature's desire to allow such control over housing problems which are essentially local in concern and thus should be local in solution.

But we need not look to the aforementioned statutes for the authority of Clifton to legislate on the subject matter involved. I recognize that a municipality must act within the bounds of its delegated authority. *Ringlieb v. Tp. of Parsippany-Troy Hills*, 59 *N. J.* 348 (1971); *In re Public Service Elec. & Gas Co.*, 35 *N. J.* 358 (1961). The New Jersey Constitution qualifies that axiom by declaring that laws concerning municipal corporations be liberally construed in their favor and shall include not only powers expressly granted but also those which are necessary or incidental to the powers conferred. *N. J. Const.* (1947), Art. IV, § VII, ¶ 11:

> The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.

*N. J. S. A.* 40:48–2[4] has consistently been broadly con-

---

[4] 40:48–2. Other necessary and proper ordinances

Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

strued and found to be a repository of general municipal police power under which the present ordinance could be enacted. Both Chief Justice Weintraub in *Summer v. Teaneck*, 53 *N. J.* 548 (1969) and Justice Mountain in *N. J. Builders Ass'n v. Mayor, E. Brunswick Tp.*, 60 *N. J.* 222 (1972), refer to this legislation. Both opinions state that this statute has been held to effect a broad grant of police powers to municipalities. Thus, the history of the police power is a story of growth and ever-increasing restraints upon property rights. The police power must include a vast reservoir. Chief Justice (then Judge) Weintraub, writing in the lower court in *Wagner v. Mayor, etc., City of Newark*, 42 *N. J. Super.* 193 (Law Div. 1956), rev'd 24 *N. J.* 467 (1957), expounded upon the increasing scope of police power and municipal authority.

> \* \* \* The history of the police power is a story of ever-increasing restraint upon property rights. With economic growth, industrial innovations, greater concentrations of population, phenomenal mobility, an exercise of property rights which at one time was innocuous may today menace the public welfare. The police power must include a vast reservoir if government is to be equal to the obligation to govern. The march of events has required new legislative expressions at the state level. Local demands have kept pace. The delegable police power must be equal to the task of meeting them. Today many municipalities have populations exceeding those of some states. Manifestly, the delegable police power may not be said to be constitutionally fixed in terms of the problems of an ancient village. [42 *N. J. Super.* at 205; citations omitted].

The breadth of such power is exemplified in the following recent plethora of widely diversified cases which have all been held to be legitimate exercises of police power under *N. J. S. A.* 40:48-2: an ordinance requiring the removal of dog excrement — *Town of Nutley v. Forney*, 116 *N. J. Super.* 567 (Cty. Ct. 1971); an ordinance requiring multiple dwelling owners to post security for emergency repairs — *Apt. House Coun. v. Mayor & Coun., Ridgefield*, 123 *N. J. Super.* 87 (Law Div. 1973), aff'd 128 *N. J. Super.* 192 (App. Div. 1974); an ordinance designed to pre-

vent blockbusting — *Summer v. Teaneck, supra;* an ordinance controlling rent — *Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* 521 (1973); an ordinance licensing real estate brokers who make personal solicitations — *Mogolesfsky, et al. v. Schoem, et al.,* 50 *N. J.* 588 (1967); an ordinance licensing building contractors — *New Jersey Builders Ass'n v. Mayor, E. Brunswick Tp., supra;* an ordinance regulating the size and placement of commercial signs — *State v. Boston Juvenile Shoes,* 60 *N. J.* 249 (1972); an ordinance regulating taxi rates — *Yellow Cab Corp. v. City Coun., Passaic,* 124 *N. J. Super.* 570 (Law Div. 1973); an ordinance preventing one's presence in a municipal park after dark — *Borough of Dumont v. Caruth,* 123 *N. J. Super.* 331 (Mun. Ct. Dumont 1973); an ordinance licensing cigarette machines — *Coast Cigarettes Sales, Inc. v. Mayor, Coun., Long Branch,* 121 *N. J. Super.* 439 (Law Div. 1972); an ordinance regulating the placement of juke boxes — *Silco Automatic Vending Co. v. Puma,* 108 *N. J. Super.* 427 (App. Div. 1970).    ⅼ

When these cases are distilled, three fundamental essences can be extracted from the residue. In each instance the court had only to find that (1) the ordinance in question was reasonably related to the general health, safety or welfare of the local residents; (2) the ordinance did not involve a subject matter requiring State-wide regulation; and (3) the ordinance did not contravene any specific statutory or constitutional limitation. See *Gundaker Central Motors v. Gassert,* 23 *N. J.* 71 (1956), appeal dismissed, 354 *U. S.* 933, 77 *S. Ct.* 1397, 1 *L.Ed.* 2d 1533 (1957).

It seems fairly obvious to me that the present municipal ordinance remains within the bounds of this tripartite standard and is, therefore, a valid exercise of police power under *N. J. S. A.* 40:48–2, without further reference to and consideration of the more narrowly construed *N. J. S. A.* 40:48–2.3.

## II

Plaintiff further pursues his attack upon the ordinance, claiming that it has violated due process. Numerous cases have held that where a fundamental right is not involved, due process merely requires that the police power be exercised reasonably. The demands of due process were summarized by Justice Hall:

* * * [T]he regulation must not be unreasonable, arbitrary or capricious, the means selected must have a real and substantial relation to the object sought to be attained, and the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need or substantially affect uses which do not partake of the offensive character of those which cause the problem sought to be ameliorated. [*Kirsch Holding Co. v. Borough of Manasquan*, 59 *N. J.* 241, 251 (1971)].

See also *Gundaker Central Motors v. Gassert, supra,* 23 *N. J.* at 71; *Schmidt v. Bd. of Adjustment, Newark,* 9 *N. J.* 405 (1952) ; *Gabe Collins Realty, Inc. v. City of Margate City,* 112 *N. J. Super.* 341 (App. Div. 1970); *Larson v. Mayor, et al.,* 99 *N. J. Super.* 365 (Law Div. 1968).

Mr. Sente, naturally, does not argue that municipalities cannot create ordinances to protect the public health, welfare and safety. He does, however, contend that the selected means were unduly restrictive and, therefore, inappropriate and unreasonable.

Housing ordinances cover three general subjects: (1) maintenance of necessary facilities, *i. e.,* lighting, ventilation, sinks and toilets; (2) limitation of density of occupancy by prescribing a minimum floor area for a specified number of occupants; (3) standards of maintenance and cleanliness for the building, *i. e.,* elimination of rodents, vermin, dampness and general unsanitary conditions.

It is well recognized that in the adoption of such ordinances, the municipality has wide discretion as to the means utilized to meet the public need and to suppress an evil; as long as the means are reasonably related to a legitimate objective, an ordinance will not violate substantive due proc-

ess. *Nebbia v. New York*, 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L.Ed.* 940 (1934). See *Del Vecchio v. South Hackensack Twp.*, 49 *N. J. Super.* 44 (App. Div. 1958); *Bellington v. Tp. of East Windsor*, 32 *N. J. Super.* 243 (App. Div. 1954), aff'd, 17 *N. J.* 558 (1955). That legitimate objective is the safeguarding of the public health, safety and morals. Indeed, all presumptions are indulged in favor of the validity and reasonableness of a properly enacted municipal ordinance. Consequently, the burden is upon the plaintiff to demonstrate its unreasonableness. *Spiegle v. Beach Haven*, 46 *N. J.* 479, *cert.* den. 385 *U. S.* 831, 87 *S. Ct.* 63, 17 *L.Ed.* 2d 64 (1966); *Garden State Racing Ass'n v. Cherry Hill Tp.*, 42 *N. J.* 454 (1964); *McLarty v. Borough of Ramsey*, 270 *F.* 2d 232 (3 Cir. 1959); *Kroeger v. Stahl*, 248 *F.* 2d 121 (3 Cir. 1957); *Moyant v. Paramus*, 30 *N. J.* 528 (1959); *Ward v. Montgomery Tp.*, 28 *N. J.* 529 (1959); *Samuel Braen, Inc. v. Waldwick*, 28 *N. J.* 476 (1958).

Authorities have held that there exists a relation between an individual's living space and his physical, emotional and mental well-being. This Court, in *Lionshead Lake, Inc. v. Twp. of Wayne*, 10 *N. J.* 165 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L.Ed.* 708 (1953), has said:

* * * We may take notice without formal proof that there are minimums in housing below which one may not go without risk of impairing the health of those who dwell therein. * * * [10 *N. J.* at 173].

See also concurring opinion of Justice Jacobs at 176; see *Brundage v. Randolph Tp.*, 54 *N. J. Super.* 384 (App. Div.), aff'd, 30 *N. J.* 555 (1959); *Appeal of Medinger*, 377 *Pa.* 217, 104 *A.* 2d 118 (Pa. Sup. Ct. 1954); *Corning v. Town of Ontario*, 204 *Misc.* 38, 121 *N.Y.S.* 2d 288 (N.Y. Sup.Ct. 1953); 7 *McQuillin, Municipal Corporations* (3d ed. 1968), § 24.545; Annotation, "Validity and construction of zoning regulations prescribing minimum floorspace or cubic content of residence," 96 *A.L.R.* 2d 1409 (1964); Haar, "Zoning for Minimum Standards: The Wayne Township Case," 66 *Harv. L. Rev.* 1051 (1953). See generally, *Britten,*

Brown & Altman, "Certain Characteristics of Urban Housing and Their Relationship to Illness and Accidents" in *Housing for Health,* 170–76 (American Public Health Association 1941) ; Mood, "The Development, Objective and Adequacy of Current Housing Code Standards," in *Housing Code Standards: Three Critical Studies,* 18–19, 29–30 (National Commission on Urban Problems Research Report No. 19, 1969).

Plaintiff does not dispute this widely acknowledged relation. He does, however, disagree with defendants' contention that since the relationship concededly exists and the ordinance has a legitimate governmental objective, it is, therefore, a valid and reasonable exercise of police power. Clifton supports the reasonableness of its ordinance by relying upon the affidavit of Mr. Palfreyman, a licensed sanitary inspector of New Jersey and health officer of Clifton. He testified that the floor space minimums were proper, and, in fact, they were substantially identical to the suggested minimums promulgated in the proposed model New Jersey State Housing Code and the sample ordinance suggested by the United States Public Health Service.

In addition, I may take notice of the fact that the minimums in the Clifton ordinance are closely comparable to minimums recommended in various sets of standards prepared by the expert staffs of the Building Officials Conference of America, the International Conference of Building Officials, and the Southern Building Code Congress. *See National Commission on Urban Problems, Building the American City,* H.Doc. No. 34, 91st Cong., 1st Sess. 278 (1968) ; *see also N.J.A.C.* 5 :10–6.3. Indeed, the expert staff of the National Commission on Urban Problems strongly doubted the adequacy of the 150 square foot per person minimum at issue here. *Id.* at 278–79.

Plaintiff, on the other hand, although given every opportunity, produced no evidence regarding the alleged unreasonableness of the ordinance and, therefore, failed to sustain his burden of proof. While I concede that the ordinance

could have been more carefully drafted, that is a matter for the municipal council.

[I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," * * * that a legislature need not "strike at all evils at the same time, * * * and that "reform may take one step at a time," addressing itself to the phase of the problem which seems most acute to the legislative mind." [*Katzenbach v. Morgan*, 384 *U. S.* 641, 657, 86 S. Ct. 1717, 1727, 16 L. Ed. 2d 828 (1966); citations omitted].

Summary judgment under *R.* 4:46–2 was, thus, properly granted since no genuine issue of fact existed. *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N. J.* 67, 73–75 (1954).

## A

There is, however, one significant and established exception to the above due process standard, and that is, of course, where an ordinance affects a fundamental constitutional right. In these instances, the state is obligated to demonstrate a compelling state interest in order to sustain the statute. *Memorial Hospital v. Maricopa County*, 415 *U. S.* 250, 94 *S.Ct.* 1076, 39 *L.Ed.* 2d 306 (1974); *Roe v. Wade*, 410 *U. S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.* 2d 147, reh. den., 410 *U.S.* 959, 93 *S.Ct.* 1409, 35 *L.Ed.* 2d 694 (1973); *Shapiro v. Thompson*, 394 *U.S.* 618, 89 *S.Ct.* 1322, 22 *L.Ed.* 2d 600 (1969); *Griswold v. Connecticut*, 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.* 2d 510 (1965); *Dunn v. Blumstein*, 405 *U.S.* 330, 92 *S.Ct.* 995, 31 *L.Ed.* 2d 274 (1972). Plaintiff alleges that the ordinance improperly deters him from enjoying his fundamental rights, *e. g.*, the right to privacy, the right to have and rear children, the right to marry, the right to the free exercise of religion, and the right not to be uprooted. Each of these has been found to entail a fundamental right, with the exception of the last. See *Roe v. Wade, supra; Meyer v. Nebraska*, 262 *U.S.* 390, 43 *S.Ct.*

625, 67 *L.Ed.* 1042 (1923); *Loving v. Virginia,* 388 *U.S.* 1, 87 *S.Ct.* 1817, 18 *L.Ed.* 2d 1010 (1967); *Sherbert v. Verner,* 384 *U. S.* 398, 83 *S.Ct.* 1790, 10 *L.Ed.* 2d 965 (1963); *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.* 2d 551 (1972).

Plaintiff contends that even if no fundamental rights were directly affected, they were certainly indirectly interfered with. I must state unequivocally, as did the Appellate Division, that there is not an iota of proof that this ordinance fosters compulsory or indirect birth control, abortion or sterilization programs. It has not been demonstrated nor has any evidence been offered that the effect of the ordinance is to unlawfully discriminate against any social, economic or ethnic group. If I concluded that this ordinance was enacted for any of the above purposes, I would strike it down. Nor, despite the contrary suggestions of the majority, is there any indication, either within the record or outside it, that this ordinance is tantamount to exclusionary zoning. There is no evidence of exclusionary purpose or effect. This ordinance is plainly and simply a reasonable and justified health measure. It is perhaps useful to note that the National Commission on Urban Problems, which has issued one of the most forceful and persuasive denunciations of exclusionary zoning practices now available, *National Commission on Urban Problems, Building the American City,* H. Doc. No. 34, 91st Cong., 1st Sess. 18–20, 199–234 (1968), expressly distinguished minimum floor space requirements in housing codes, *id.* at 215, and went on to firmly urge that present minimum floor space standards were inadequate and should be increased to figures far greater than those adopted by Clifton. *Id.* at 278–79. This ordinance is clearly and simply a health measure.

I cannot find that plaintiff was significantly discouraged in the exercise of any of his fundamental rights. Indeed, this conclusion is supported by the only court to consider the constitutionality of a municipal ordinance substantially similar to the present one. In *Nolden v. East Cleveland*

*City Commission*, 12 *Ohio Misc.* 205, 232 *N.E.* 2d 421 (Com. Pleas Ct. 1966), such an ordinance was upheld as a valid exercise of police power. The ordinance read:

Every dwelling until shall contain at least one hundred and fifty (150) square feet of habitable floor area for the first occupant thereof and at least one hundred (100) additional square feet of habitable floor area for every additional occupant thereof, but in no case shall any dwelling unit contain less than two hundred and fifty (250) square feet of habitable floor area. [232 *N. E.* 2d at 423].

The Ohio court reasoned that the purposes of the housing code were within the scope of police power; in other words, they were:

* * * to establish and enforce minimum standards necessary to make and maintain all dwelling structures as safe, sanitary structures, free from fire and health hazards, fit for human habitation and beneficial to the general welfare. [232 *N. E.* 2d at 423].

In concluding, the court said:

From the evidence before this court, it would appear that classification by square footage per person is a suitable means to the end in view, has a definite relation to the health and welfare of the community and is thus a reasonable basis for classification. There has been no deprivation of the appellants' constitutional "due process." * * * [232 *N. E.* 2d at 426].

## B

Plaintiff again challenges the statute on due process grounds. He contends that the ordinance creates an irrebuttable presumption not supported by the factual circumstances in that it is presumed that a health hazard is created whenever the minimum footage requirements are not met.

The United States Supreme Court has recently reviewed a number of cases where a statutory presumption was attacked on due process grounds. In *Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.* 2d 551 (1972), for example, it was assumed that an unwed father was an unfit parent for the purpose of awarding child custody. He was

denied an opportunity to prove his fitness as a parent-guardian. The Court said that the state had a legitimate interest in the welfare of the child, but noted that the state's inerest would be minimal if the father were shown to be fit. The Court found that the convenience to the state in assuming rather than proving unfitness, could not justify denying the father a hearing. In concluding, the Court stated:

> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand. [405 U. S. at 656, 92 S. Ct. at 1215, 31 L. Ed. 2d at 562].

Again, the Court dealt with a similar problem in *Vlandis v. Kline*, 412 *U.S.* 441, 93 *S.Ct.* 2230, 37 *L.Ed.* 2d 63 (1973). A Connecticut statute creating an irrebuttable presumption came under attack. The statute determined that a married Connecticut state college student was an out-of-state resident if he had an out-of-state address when he applied for admission; or if single, he had an out-of-state address at some time during the preceding year. The Court held that due process required that students be given an opportunity to demonstrate that they are bona fide residents, especially where alternative means of determining their status were available to the state. The Court declared:

> * * * The State's interest in administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised. * * * [412 U. S. at 451, 93 S. Ct. at 2236, 37 L. Ed. 2d at 71].

I find these cases distinguishable from the present situation in that we are not dealing with "past formalities," but are eminently concerned with the present reality of

health. Indeed, plaintiff was given 60 days to produce evidence of the ordinance's unreasonableness, which he totally failed to do. As a matter of fact, plaintiff's wife felt that their living conditions were not suitable in relation to their family size. I, therefore, can find no merit in plaintiff's contention, since it became moot when he was remiss in producing no contrary evidence.

## IV

Plaintiff continues his attack on the ordinance: this time utilizing the second potent prong of the Fourteenth Amendment, *i. e.*, the equal Protection clause. Plaintiff claims that the ordinance violates the equal protection clause "by its harsh impact on large families, the poor and racial minorities." Defendant counters stating that the ordinance does not discriminate since it is "eminently responsive to the needs of all citizens for minimally adequate housing."

The equal protection clause does not prevent the State from classifying pursuant to its police power and permits wide discretion in doing so. *Morey v. Doud,* 354 *U.S.* 457, 77 *S.Ct.* 1344, 1 *L.Ed.* 2d 1485 (1957); *David v. Vesta Co.,* 45 *N. J.* 301 (1965); *Schmidt v. Bd. of Adj. of Newark, supra,* 9 *N. J.* at 405 (1952). When an ordinance is attacked on equal protection grounds, it is evaluated by one of two tests. In most cases, the classification will be upheld if it bears a rational relationship to a permissible state objective. *Dandridge v. Williams,* 397 *U. S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.* 2d 491, reh. den. 398 *U.S.* 914, 90 *S.Ct.* 1684, 26 *L.Ed.* 2d 80 (1970); *Gundaker Central Motors v. Gassert, supra,* 23 *N. J.* at 71; *Schmidt v. Bd. of Adj. of Newark, supra.* Where, however, the State or municipal legislation infringes upon a fundamental right, the State must demonstrate that it is justified by a compelling state interest. See, *Shapiro v. Thompson, supra; Memorial Hospital v. Maricopa County, supra; Houston v. Prosser,* 361 *F. Supp.* 295 (N.D. Ga. 1973). In addition to these two tests, the Supreme Court has developed a third variation in *Reed*

v. *Reed,* 404 *U.S.* 71, 92 *S.Ct.* 251, 30 *L.Ed.* 2d 225 (1971) and *Eisenstadt v. Baird,* 405 *U.S.* 438, 92 *S.Ct.* 1029, 31 *L.Ed.* 2d 349 (1972). *Quoting from Royster Guano Co. v. Virginia,* 253 *U.S.* 412, 40 *S.Ct.* 560, 64 *L.Ed.* 989 (1920), the Reed Court stated:

* * * A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." [404 U. S. at 76, 92 S. Ct. at 254, 30 *L. Ed.* 2d at 229].

Apparently, this "substantial relation" criterion was created to moderate between the extremes of the two traditional tests. *See* Gunther, "In Search of Evolving Doctrines of a Changing Court: A model for a Newer Equal Protection," 86 *Harv. L.Rev.* 1 (1972).

The United States Supreme Court has recently considered an equal protection challenge based on wealth in *San Antonio School Dist. v. Rodriguez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.* 2d 16, reh. den. 411 *U.S.* 959, 93 *S.Ct.* 1919, 36 *L.Ed.* 2d 418 (1973). The Court observed that there were two prevalent characteristics held in common by the poor in wealth discrimination litigation: (1) because of their impecunity, the members of this class are completely unable to pay for some desired benefit and (2) as a consequence, there is an absolute deprivation of a meaningful opportunity to enjoy that benefit. But, the Court clearly stated that where wealth is evaluated, equal protection does not involve absolute equality or precisely equal advantages, nor does wealth discrimination alone compel scrutiny.

This same theme was reiterated in *Amen v. City of Dearborn,* 363 *F.Supp.* 1267 (E.D. Mich. 1973). City plans called for a section of the city to be demolished and rezoned for business. The Amens asserted that Dearborn's activity constituted a violation of equal protection since the clearance program was only instituted in the area with the lowest income families. Relying on *James v. Valtierra,* 402 *U. S.*

137, 91 *S. Ct.* 1331, 28 *L. Ed.* 2d 678 (1971), the court held that because a provision tended to fall more heavily on low income families did not necessarily constitute a violation of the equal protection clause. Since there was no evidence of any specific intent to discriminate against low income families, the Court held that there was no violation of equal protection.

Sente basically begins with the premise that the requirements of the ordinance have contributed to the segregation of the poor in the cities from the wealthy in the suburbs. He argues that the resultant segregation should suffice to invoke the equal protection clause. However, that clause has been used to strike only those ordinances which expressly discriminate against members of a minority, *i. e.,* a discriminatory motive or purpose must be found. As previously stated, no such motive is apparent in this case. The municipality simply wishes to regulate the health standards of its residents, which incidentally burden large families, whether they be rich or poor. Perhaps, large, poor families might find it more difficult to relocate, but this is not a legitimate reason for the lessening of necessary minimal health standards.

Recently, in *Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797 (1974), a New York village ordinance was attacked on equal protection grounds. The zoning ordinance restricted land use to one-family dwellings and defined a "family" as being one or more persons, related by blood, adoption or marriage, or not more than two unrelated persons living together as a single housekeeping unit. The Supreme Court reversed the lower court's determination that the ordinance was unconstitutional. Mr. Justice Douglas, speaking for the Court, declared:

* * * We deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be "reasonable, not arbitrary" (quoting *Royster Guano Co. v. Virginia,* 253 *U. S.* 412, 415, 40 *S. Ct.* 560, 64 *L. Ed.* 989), and bears "a rational

relationship to a [permissible] state objective." *Reed v. Reed*, 404 *U. S.* 71, 76, 92 *S. Ct.* 251, 30 *L. Ed.* 2d 225.

It is said, however, that if two unmarried people can constitute a "family," there is no reason why three or four may not. But every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative not a judicial function. [416 U. S. at 6, 94 S. Ct. at 1540, 39 *L. Ed.* 2d at 803–804].

Continuing in a footnote, he quoted from Mr. Justice Holmes:

"* * * the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." [416 U. S. at 6, 94 S. Ct. at 1540, 39 *L. Ed.* 2d at 804, footnote 5].

Accord, *United States v. Kras*, 409 *U. S.* 434, 93 *S. Ct.* 631, 34 *L. Ed.* 2d 626 (1973).

The municipalities of this State have attempted to employ various means to limit the number of occupants per dwelling. The two most common methods were either to use a zoning ordinance which defined a "family" unit, *e. g., Gabe Collins Realty, Inc. v. City of Margate City*, 112 *N. J. Super.* 341 (App. Div. 1970) and *Kirsch Holding Co. v. Borough of Manasquan*, 59 *N. J.* 241 (1971), or to use the general police power under *N. J. S. A.* 40:48–2. By virtue of the authority of two distinct statutes, the end result is the same. The zoning ordinance applies to a specific restricted area which is distinguishable from the ordinance enacted under the general police power; the latter applies to the entire community. The area restricted is, however, the only distinguishing characteristic. In each instance, the definition of "family" was found to be sweepingly excessive and overly broad, since it precluded many harmless dwelling uses even though no threat to the public health, safety or welfare existed and was, therefore, legally unreasonable. In concluding, however, Justice Hall in *Kirsch Holding Co. v. Borough of Manasquan, supra,* suggested that the municipalities were not without power to deal with the problems in a manner similar to that used in the Clifton ordinance:

\* \* \* When intensity of use, i. e., overcrowding of dwelling units and facilities, is a factor in that conduct . . ., consideration might quite properly be given to zoning or housing code provisions, which would have to be of general application, limiting the number of occupants in reasonable relation to available sleeping and bathroom facilities or requiring a minimum amount of habitable floor area per occupant. \* \* \* [59 *N. J.* at 254].

It should be noted that *Belle Terre* appears to have taken a view different from *Kirsch Holding Co., supra*. However, this goes to strengthening my position in the present instance. Certainly, if a municipality can regulate the type of occupants living in a single dwelling by "economic and social legislation," a health ordinance limiting the number of persons per unit is just that much more compelling. In both instances, the number of people are effectively limited, one for social and economic reasons, and, in the instant matter, for health reasons. In my opinion, the latter is by far a more powerful reason than the former, yet the former need only comply with the rational relations test under the equal protection clause.

## V

This ordinance bears a substantial relation to the public health, safety, welfare and morals of the people of the City of Clifton. Congestion, density and lack of space are the most forceful contributions to the transmission of disease. The health of an individual is no longer a private affair. Housing and health bear an irrefutable relationship.

Whatever inadequate housing contributes to illness — and it is substantial with segments of our population — must continue to be halted; at least a beginning must be made in the area of limitation of density of occupancy as to existing properties. Compliance with minimum floor area for a specified number of occupants can be realized by limiting the number of occupants therein — particularly in rooms which are rented. This is not an ordinance that was enacted with an "improper purpose". If I remotely believed that this

ordinance was intended, as suggested by the majority, to exclude "poor families predominantly from minority groups" or was intended to exclude any of those people who already are disinherited from our society, I would be the first to strike it down.

Merely because these properties complied with the requirements in effect at the time they were constructed, does not mean that they cannot be subjected to reasonable regulations and ordered to comply with new requirements at this time. This cannot be the criterion to determine if the municipality by virtue of this ordinance acted reasonably in limiting density of occupancy. Our knowledge of public health resulting from crowding people in communities has expanded over the years. That which was not deemed essential 25 years ago has become important in the mind of an expert.

Justice Heher in *Earruso v. Bd. of Health of East Hanover Twp.*, 120 *N. J. L.* 463 (Sup. Ct. 1938), said:

\* \* \* It is a fundamental obligation of the social compact to endure burdens that are mere incidents of measures reasonably designed to serve the essential common interest. \* \* \* [120 *N. J. L.* at 468].

In *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills*, 28 *N. J.* 423 (1958), Justice Burling quoted from *Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949):

\* \* \* All property is held in subordination to the police power, and the correlative restrictions upon individual rights — either of person or of property — are incidents of the social order, deemed a negligible loss compared with the resultant advantages to the community as a whole if not, indeed, fully recompensed by the common benefits. [28 *N. J.* at 437].

An owner or tenant of property does not acquire immunity against the exercise of the police power. That is one of the least limitable of governmental powers. And neither owner nor tenant has a constitutional right to live in unhealthy or slum dwellings.

The present ordinance is a legitimate exercise of the general police  power of the City of Clifton.

I would affirm.  Justice Mountain has authorized me to state that he joins in this opinion.

*For dismissal*—Chief Justice HUGHES and Justices JACOBS, HALL, SULLIVAN and CLIFFORD—5.

*For affirmance*—Justices PASHMAN and MOUNTAIN—2.